(Nos. 41358, 41359 cons.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, *vs.* AL-
FRED ARMSTRONG and JERRY SUMLIN, Appellants.

*Opinion filed November 22, 1968.—Modified on denial of rehearing
January 29, 1969.*

WARD, J., took no part.

GERALD W. GETTY, Public Defender, of Chicago (GEORGE L. LINCOLN and JAMES J. DOHERTY, Assistant Public Defenders, of counsel,) for appellants.

WILLIAM G. CLARK, Attorney General, of Springfield, and JOHN J. STAMOS, State's Attorney, of Chicago, (FRED G. LEACH, Assistant Attorney General, and ELMER C. KIS-

SANE and JAMES R. TRUSCHKE, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE KLINGBIEL delivered the opinion of the court:

Four men were indicted and tried for murder in a jury trial in the circuit court of Cook County. The court directed a verdict of not guilty as to one, Arthur Hale, and the other three were convicted. Alfred Armstrong, who received a sentence of 100 to 150 years, and Jerry Sumlin, who received a sentence of 50 to 100 years, have appealed. Vernon Rhodes has appealed separately.

The murder occurred during an attempted robbery of a tavern in Chicago about 1:45 o'clock in the morning on April 19, 1966. Two men, one carrying a shotgun and the other a .38 caliber revolver, entered the front door and announced a stick-up. Almost immediately there was a flurry of shots and decedent, an off-duty policeman sitting at the bar, was killed by two bullets to the head. In addition his right hand was mangled by a shotgun blast. Two other men sitting at the bar and the bar maid, Ann O'Donnell, testified as occurrence witnesses.

John Auskalnis, a school janitor, stated that he was sitting on the second stool about 5 or 6 feet from the front window and door; that he saw a young colored boy, whom he later identified as Rhodes, walk past the front window, followed almost immediately by Sumlin and Armstrong; that at that time the decedent, sitting to his right on the stool next to the window, wondered out loud what that youngster was doing out at such a late hour; that Armstrong and Sumlin came into the tavern with Armstrong in the lead carrying a shotgun and he heard one of them announce a stick-up; that decedent whirled and pushed him (Auskalnis) off his stool and as he fell he heard the shotgun blast and 4 or 5 shots from a gun, after which the robbers ran. Both before and during the trial this witness

was positive in his identification of these three defendants.

Ann O'Donnell stated that she was standing behind the bar up front by the decedent. She too saw Rhodes first as he passed by the front window followed by the other two. She stated Armstrong entered first with his shotgun and Sumlin was immediately behind him with something in his right hand that looked like a gun, and that Rhodes stood behind them just outside the front door. As someone announced a stick-up she said the decedent swung around, and as he pulled out his gun, she heard the shotgun blast. Immediately she ducked behind the bar, heard 4 or 5 shots and then, when she heard decedent fall, she raised up to see the men running out. She too identified these three defendants positively both before and during the trial and stated further that the shotgun introduced in evidence looked similar to the one used by Armstrong.

Gerald Swaluis, a fireman, testified that he was sitting farther down the bar about 20 or 25 feet from the front; that he also saw three men pass the window; that he was just getting up to leave when he heard the explosion and saw decedent fall; that he immediately ran to the back room looking for a way out and he was unable to identify any of the three men.

Walter Powell identified Armstrong, Sumlin and Rhodes as the same three men who had robbed his tavern about 3 miles away at approximately 1:30 o'clock A.M., or 15 minutes before the shooting. He stated that Armstrong had carried a shot gun and that Rhodes had taken a .38 caliber revolver from the tavern. Emil Miskunis, a bartender at a tavern about 2½ miles away, stated that the same three men had robbed his tavern at about 1:15 o'clock that same night and one of them carried a shotgun.

Alvin Adams, an acquaintance of defendants, refused to testify until granted immunity from any prosecution except perjury. He testified that he saw Hale, Rhodes, Sumlin and Armstrong at a vacant building on Flournoy Street

about 10:00 o'clock in the evening immediately preceding the shooting and that they had borrowed his car. When they later returned to the building Armstrong was bleeding badly and complaining that he was hurt, asking that someone, "Get this out of me." Sumlin talked to Adams alone and told him that Armstrong got hurt trying to rob a tavern and Rhodes told him out of the presence of anyone else that Armstrong shot a man and he thought it was a "police". Adams also stated that he saw the revolver and shotgun they had with them and that at Armstrong's request he had taken the shotgun to Mrs. Armstrong's house. When he got into his car he noticed blood stains on the front seat.

In a search of Armstrong's apartment a .38 caliber pistol and a shotgun were seized and later introduced in evidence at the trial. A ballistics expert testified that one of the bullets recovered from decedent's body had definitely been fired from this pistol.

It was stipulated that Armstrong was 23 years of age, Hale and Rhodes, 20, and Sumlin 18. Except for character witnesses no other evidence was offered on behalf of defendants.

Defendants do not argue the sufficiency of such evidence to convict but contend that a number of trial errors prejudicially affected the jury's verdicts. They contend that the search which produced the weapons placed in evidence was illegal; that the testimony of Alvin Adams was inadmissible under the "fruit of the poisonous tree" doctrine; that evidence of a separate robbery unrelated to the crime charged was improperly admitted; that statements of co-defendants accusing Armstrong of the crime should have been excluded; that there was a break in the chain of proof on the bullets; that the prosecutor's final argument was improper; and that the common-design rule making all participants equally liable for one another's actions is outmoded and should be abandoned.

The trial court allowed a motion to suppress Armstrong's confession under the rule of *Miranda* v. *Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, but he denied the motion as to the revolver and shotgun, finding that Armstrong had consented to the search of his apartment. The evidence on the motion to suppress the guns is somewhat confusing in that it was considered by the court on three different occasions, both before and during the trial. In the first hearing two officers testified that Armstrong had been taken into custody the afternoon of April 19 for an assault on a teacher at Marshall High School. He was asked about his activities on the previous day and how he had received the gunshot wounds on his left hand and arm. He explained that someone he knew by the name of Walter and another man had jumped into his car near the school and had asked him to drive them away quickly; that later two policeman had come to his house looking for Walter for assaulting the school teacher; that when he went to a pool hall to look for Walter about ten men had charged him, accusing him of being an informer, and that as they chased him Walter had fired several shots at him hitting him in the arm. When asked if he had any objections to the police checking his story and searching his apartment he replied that he did not, that he didn't have the key but that his wife would let them in, and if she were not home they could find her at her mother's house, and he gave them her address. At the apartment the police identified themselves to Armstrong's brother-in-law who was baby sitting, explained their purpose and began their search. In 10 or 15 minutes, after they had found a shotgun in a closet, Mrs. Armstrong came home. When she was informed of the reason for their presence and that Armstrong had given his consent to the search, she produced a .38 revolver from a dresser drawer underneath some stockings. Armstrong denied he had given consent and Mrs. Armstrong denied producing or knowing anything about the

gun. At this time the court denied the motion to suppress stating that the issue was one of credibility, that he believed the police officers and not the Armstrongs, and that Armstrong in giving his consent was merely trying to talk the police into believing his story as to how he had incurred his wounds.

Subsequently, during the course of the trial, after hearing the testimony of Adams concerning the manner in which he was picked up by the police, the court announced that he had certain misgivings about his prior ruling on the motion to suppress and that he was now inclined to reverse himself. After listening to the argument of the prosecutor that Adams's testimony had no relevancy on the issue and that it was a little late to reverse himself as all defendants were now in jeopardy, the court allowed his original ruling to stand.

Once again, at the close of the State's case and on motion of defendants, four additional police officers were heard concerning the search and Armstrong's consent. At the conclusion of this testimony the court announced that he was now firmly convinced of the credibility of the officers as opposed to the Armstrongs and that he had allowed repeated inquiry on the subject only to give the defendants every opportunity to prove otherwise.

It is well settled that one who consents to a search of his property waives his constitutional rights to complain that the search and seizure were unlawful. (*People* v. *Mathews,* 406 Ill. 35.) Whether consent has been given in a particular case is a factual question to be determined in the first instance by the trial court, and where the evidence is in conflict this court will accept the finding below unless it is clearly unreasonable. (*People* v. *Fiorito,* 19 Ill.2d 246; *People* v. *Peterson,* 17 Ill.2d 513.) Here, we have carefully reviewed the record and find that the trial court considered every phase of the question to an unusual degree and we fully acquiesce in his conclusion.

Next, defendants contend that Alvin Adams's testimony was incompetent because he was discovered as a result of Armstrong's inadmissible confession and that this witness himself was a "fruit of the poisonous tree" and was as unavailable to the prosecution as books, records or other property discovered in an illegal search and seizure. We agree that academically this argument has merit, for we have previously held that a witness discovered as a result of an illegal search of a defendant's home is not a competent witness, the theory being that except for the illegal search the witness would not have been obtained. (*People* v. *Albea,* 2 Ill.2d 317.) But we have been unable to find, nor have defendants pointed out, anything indicating that the statements or confession of Armstrong led to Adams. Contrary to defendants' implications the confession makes no mention of Adams. To contend that Adams was a fruit of the poisonous tree is pure speculation, and defendants' objection to his testimony sheds no light upon the subject. It was neither specific nor did it include a request for an opportunity to prove that Adams was discovered by reason of some unlawful means. Under such circumstances the trial court had no alternative but to deny defendants' motion to exclude the testimony of this witness, for there was nothing before him upon which to base a different ruling. An analogous situation is contained in the case of *Nardone* v. *United States,* 308 U.S. 338, 84 L. Ed. 307, 60 S. Ct. 266, and we subscribe to the statement therein made that, "The burden is, of course, on the accused in the first instance to prove to the trial court's satisfaction that wire-tapping was unlawfully employed. Once that is established * * * the trial judge must give opportunity, however closely confined, *to the accused to prove* that a substantial portion of the case against him was a fruit of the poisonous tree. This leaves ample opportunity to the Government to convince the trial court that its proof had an independent origin." (Emphasis supplied.)

On the question of admissibility of evidence relating to prior robberies, defendants object only to the first tavern incident, admitting that evidence was admissible on the robbery of the second tavern from which the pistol was taken. This contention is wholly without merit for it has long been established that evidence of other crimes is admissible where such evidence tends to prove common design, motive and identity. (*People* v. *Botulinski,* 392 Ill. 212.) Certainly, robberies of three taverns by the same three men using a shotgun and occurring within 45 minutes of one another come within the meaning and intent of such rule.

Nor is the contention that there was a break in the chain of proof on the bullets well taken. At the trial Dr. Henry testified that on April 19 at the coroner's laboratory he delivered two bullets to Officer Cha*p*man of the Crime Laboratory. Officer Cha*t*man testified that he picked up two bullets from the same doctor, on the same date at the same place. Defendants now object that the officer may or may not have been the same person by reason of the different spelling of the last name, but no such objection was made at the trial. We find that such misspelling or mispronunciation of the officer's name cannot reasonably be said to have broken the required continuity of possession.

Defendants next argue that the prosecutor's final argument was prejudicial in that he gave a biased fictional account of the shooting and made derogatory remarks about opposing counsel. We find from the record that the prosecutor's account of the crime was well within the evidence and the legitimate inferences to be drawn therefrom. His remarks that defense counsel were talking out of both sides of their mouths and painting the State's case black were not of such magnitude as to constitute prejudicial error necessitating a reversal.

The next contention of defendants involves a request to depart from the long established common-design rule, *i.e.,*

that where defendants have a common design to do an unlawful act, then whatever act any one of them does in furtherance of the common design is the act of all and all are equally guilty of whatever crime is committed. (*People v. Tarver*, 381 Ill. 411.) Presumably this argument is made on behalf of Armstrong, as it is Sumlin who fired the fatal shots, whereas Armstrong, using the shotgun, only mangled the decedent's arm. Such an argument is strange indeed, and, of course, wholly unimpressive. If anything, the facts of this case only serve to further buttress the established rule that on such a foray as these defendants embarked, all are equally liable for the consequences of their individual acts. We have fully reiterated our support of this rule in recent cases, *People v. Rybka*, 16 Ill.2d 394; *People v. Johnson*, 35 Ill.2d 624, and we continue to do so in this case. Nor do we accept defendants' argument that the statutorily defined rules on accountability (Ill. Rev. Stat. 1965, chap. 38, par. 5—2) in any way modify or abrogate the common-design rule. This section provides that a person is legally accountable for the conduct of another when "(c) Either before or during the commission * * * he solicits, aids, abets, or agrees or attempts to aid, such other person in the planning or commission of the offense." Applying this section to this case the attempted robbery was the offense which the defendants were jointly committing and each was legally accountable for the conduct of the other. The result was murder, the killing of an individual without lawful justification while attempting or committing a forcible felony other than voluntary manslaughter. Ill. Rev. Stat. 1965, chap. 38, par. 9—1(a)(3).

We come now to defendants' final argument. As stated previously, Sumlin and Rhodes separately and privately told Adams that Armstrong got shot trying to rob a tavern and that Armstrong shot a man and it was thought he was a "police". When Adams testified to these statements counsel objected and moved for a mistrial. In each instance the trial

court sustained the objection as to all defendants except the one to whom the statement was attributed and instructed the jury that such evidence was to be considered only as to the defendant who made the statement. Since both statements referred to Armstrong only and did not mention or implicate either Sumlin or Rhodes the question is limited to the affect thereof on Armstrong alone. The State argues that such statements are admissible provided that a cautionary instruction as to the other defendants is given as was done in this case. This is the holding in *Paoli* v. *United States,* 352 U.S. 232, 1 L. Ed. 2d 278, 77 S. Ct. 294, that a properly instructed jury would ignore one co-defendant's inculpation of another in determining the latter's guilt. But *Paoli* has since been overruled and its basic premise repudiated in *Bruton* v. *United States,* 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476. In *Bruton* it is held that despite instructions to the jury to disregard such implicating statements the admission thereof at a joint trial violates the co-defendant's right of cross-examination secured by the confrontation clause of the sixth amendment. The court reasoned that since it is impossible to determine whether in fact the jury did or did not ignore the inculpating statements in determining co-defendant's guilt, therefore, however clear such instructions may be, they cannot be accepted as an adequate substitute for defendant's constitutional right of cross-examination. We are bound by this decision as the right of cross-examination secured by the confrontation clause is applicable to the States under the fourteenth amendment (*Roberts* v. *Russell,* 392 U.S. 293, 20 L. Ed. 2d 1100, 88 S. Ct. 1921), unless we are able to say that this error was not prejudicial to the defendant. In this case we are unable to come to this conclusion. Compare *Rosochacki,* No. 39709, *Rhodes,* No. 40480, and *Somerville,* No. 40813, decided this January term, when the present petition for rehearing in this case is being considered.

We are therefore forced to hold that the admission of such statements against defendant Armstrong constituted reversible error and the judgment of the circuit court of Cook County as to Alfred Armstrong is reversed and the cause is remanded for a new trial.

As to defendant, Jerry Sumlin, we find that the evidence was sufficient to establish his guilt and that he received a fair trial, free from prejudicial error, and the judgment of the circuit court of Cook County is affirmed.

> *Reversed and remanded as to Armstrong;*
> *affirmed as to Sumlin.*

Mr. JUSTICE WARD took no part in the consideration or decision of this case.