*In re* DETENTION OF RICHARD W. BAILEY, (The People of the State of Illinois, Petitioner-Appellee, v. Richard W. Bailey, Respondent-Appellant).

First District (3rd Division)   No. 1—99—3078

Opinion filed December 6, 2000.

David C. Thomas, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb and Kenneth T. McCurry, Assistant State's Attorneys, of counsel), for the People.

JUSTICE BURKE delivered the opinion of the court:

Respondent Richard Bailey appeals from an order of the circuit court denying his motion to dismiss the State's petition to declare him a sexually violent person, contending that the Sexually Violent Persons Commitment Act (the Act) (725 ILCS 207/1 (West 1998))[1] is unconstitutional. On appeal, respondent asks us to answer the five questions certified by the trial court in the affirmative. For the reasons set forth below, we answer each of the certified questions in the negative.

## STATEMENT OF FACTS[2]

In the fall of 1989, the Chicago police department and the Cook County State's Attorney's office began investigating respondent for numerous sexual offenses directed at six boys between the ages of 5 and 10. Assistant State's Attorney Sandra Stavropoulous interviewed each victim during which interviews they described sexual acts perpetrated upon them by respondent. Thereafter, the police discovered videotapes at respondent's home documenting some of the events. Respondent was indicted with respect to each victim and indicted on one count of child pornography.

On December 18, 1990, a Supreme Court Rule 402 (177 Ill. 2d R. 402) conference was conducted. The State recommended that respondent receive a sentence of at least 50 years' imprisonment. The judge, on the other hand, agreed to impose a sentence of 17 years if respondent would agree to a stipulated bench trial. This trial was conducted

---

[1]This act authorizes the indefinite involuntary commitment of individuals found to be sexually violent after the individual has served his or her sentence.

[2]Most of these facts are taken from the parties' briefs since much of the material is not contained in the record.

on December 26, and at the conclusion of the stipulated evidence, the trial court sentenced respondent to 17 years' imprisonment.

On January 1, 1998, the State filed a petition, alleging that respondent was a sexually violent person pursuant to the Act, and sought his commitment to the Department of Human Services (the Department). Respondent was apparently the first individual petitioned for commitment under the Act. In its petition, the State alleged that respondent suffered from the mental disorders of pedophilia—same sex, and antisocial personality disorder. Respondent was 46 years old and had been attracted to prepubescent boys since he was a teenager. Respondent committed his first offense at the age of 19 when he assaulted a nine-year-old boy. Respondent was convicted in 1980 of five counts of indecent liberties with a child and sentenced to four years' imprisonment. The petition further alleged that respondent was not responsive to treatment provided to him by the sex offenders program while incarcerated because he continued to have recurrent, intense urges to have sexual contact with young boys. His treatment was therefore terminated because he refused to follow the rules and continued to make written contact with young boys. Respondent further refused to recognize the inappropriateness of his obsessions.

The petition also alleged that respondent admitted to having sexually abused at least 400 boys—200 while acting as a camp counselor in five different states and another 200 in his neighborhood. Attached to the petition was a report from a psychologist, Dr. Gerald Burgener, who, after examining respondent, opined that respondent should be civilly committed.

In response to the petition, respondent filed a motion to dismiss, contending that the Act was unconstitutional in numerous respects. Following testimony and arguments of the parties, the trial court entered a written memorandum and order on October 6, 1998, concluding that the Act was constitutional except for section 65, which deprived respondent of the right to a jury trial at a discharge hearing.[3] The trial court found that this provision violated equal protection principles, but concluded it was severable from the remainder of the Act.

Respondent filed a notice of appeal on October 27, 1998. On October 6, 1999, we granted respondent's permissive interlocutory appeal to consider five questions certified by the trial court concerning

---

[3]This section was amended by Public Act 91—227, which provided that the State and the respondent have a right to seek a jury trial at a discharge hearing. Pub. Act 91—227, eff. January 1, 2000 (amending 725 ILCS 207/65(b)(2) (West Supp. 1999)).

the constitutionality of the Act and whether it violates the equal protection clauses of the state and federal constitutions, whether it constitutes an *ex post facto* law and violates the prohibition against double jeopardy, whether it violates substantive and procedural due process, and whether it violates the petition clause of the first amendment to the United States Constitution and article I, section 5, of the Illinois Constitution.

## ANALYSIS

■■ ■ Our scope of review is strictly limited to the questions certified by the trial court. *In re Detention of Anders*, 304 Ill. App. 3d 117, 120, 710 N.E.2d 475 (1999). Our standard of review is *de novo. Anders*, 304 Ill. App. 3d at 120. All statutes carry a presumption of constitutionality and the party challenging a statute must clearly demonstrate it is unconstitutional. *In re Detention of Samuelson*, 189 Ill. 2d 548, 558, 727 N.E.2d 228 (2000). Any doubts are resolved in favor of a statute's validity, and we will uphold a statute whenever reasonably possible. *Samuelson*, 189 Ill. 2d at 558.

Initially, we note that numerous cases have addressed the constitutionality of the Act. At least two of these cases were decided prior to the time respondent filed his brief in the instant case. However, respondent failed to mention either of those cases and, in his reply brief, respondent did not cite to and/or address all of the cases that had been decided at that time. Additionally, with the exception of one case, neither of the parties has sought to supplement the record with relevant authority.

In *Samuelson*, the Illinois Supreme Court addressed, in part, the constitutionality of the Act. The *Samuelson* respondent first contended that the Act violated double jeopardy and *ex post facto* principles. The court rejected these arguments, finding that the United States Supreme Court case of *Kansas v. Hendricks*, 521 U.S. 346, 138 L. Ed. 2d 501, 117 S. Ct. 2072 (1997), was dispositive. In *Hendricks*, the Court held that a Kansas statute, very similar to the Act, was civil, not criminal, and that involuntary confinement pursuant to the statute was not punitive. *Hendricks*, 521 U.S. at 369, 138 L. Ed. 2d at 519, 117 S. Ct. at 2085. The *Hendricks* Court concluded that, for double jeopardy purposes, the initiation of commitment proceedings was not a second prosecution and, similarly, because punishment was not imposed, there were no *ex post facto* concerns. *Hendricks*, 521 U.S. at 369-71, 138 L. Ed. 2d at 519-21, 117 S. Ct. at 2085-86. The *Samuelson* court found the holdings of *Hendricks* to apply with equal force to the Act. In Illinois, proceedings under the Act are civil and there is no retroactive effect because a respondent cannot be committed based on

past conduct but only where he or she presently suffers from a mental disorder and it is substantially probable that he or she will engage in future sexually violent acts. *Samuelson*, 189 Ill. 2d at 559. Therefore, our supreme court in *Samuelson* held that the Act was not subject to challenges on *ex post facto* or double jeopardy grounds. *Samuelson*, 189 Ill. 2d at 559.

The *Samuelson* respondent next contended that the Act violated article I, section 13, of the Illinois Constitution (Ill. Const. 1970, art. I, § 13) because the Act did not afford a respondent the right to have his case decided by the court. According to him, the Act, in fact, forces a respondent to proceed to a jury if the State requests a jury. While the *Samuelson* court stated this may be true, it held that such an argument relates to criminal cases and proceedings under the Act are not criminal but rather civil and, therefore, a respondent does not have a right to waive a jury trial. *Samuelson*, 189 Ill. 2d at 560.

Lastly, the *Samuelson* respondent contended that the Act violated the equal protection clauses of the federal and state constitutions. According to him, the law was invalid because it did not afford respondents under the Act the same rights and privileges afforded to individuals facing involuntary commitment under the Mental Health and Developmental Disabilities Code (the Code) (405 ILCS 5/1—100 *et seq.* (West 1998)). *Samuelson*, 189 Ill. 2d at 562. In applying a rational basis analysis, the court rejected this argument, comparing this challenge to a similar challenge under the Sexually Dangerous Persons Act (725 ILCS 205/1.01 *et seq.* (West 1998)) in *People v. Pembrock*, 62 Ill. 2d 317, 342 N.E.2d 28 (1976). In *Pembrock*, the court concluded that persons under the Sexually Dangerous Persons Act possess characteristics that set them apart from the larger class of individuals who fall within the Code, and such persons present different societal problems. *Pembrock*, 62 Ill. 2d at 322. The *Samuelson* court reasoned that the same considerations applied to the case before it, since there were far more specific criteria necessary to meet the qualification as a sexually violent person under the Act than the criteria under the Sexually Dangerous Persons Act. *Samuelson*, 189 Ill. 2d at 563. The *Samuelson* court further reasoned that if sexually dangerous individuals present different societal problems, the same is "surely true" of individuals who qualify as sexually violent persons. *Samuelson*, 189 Ill. 2d at 563-64.

## I. Equal Protection Clauses

In the case at bar, the first certified question we are asked to consider is:

"Whether the SVP [Sexually Violent Persons] Act violates the equal

protection clauses of the federal and state constitutions because it treats persons committed under the Act differently from other civilly committed persons, and there is no compelling interest narrowly tailored to justify the discriminatory treatment[.]"[4]

■ The trial court concluded that individuals under the Act were not similarly situated to individuals under the Sexually Dangerous Persons Act, but they were similarly situated to those individuals under the Code.

Initially, respondent contends that the strict scrutiny analysis is applicable to equal protection challenges involving involuntary commitment classifications as in the instant case. This contention has been foreclosed by the *Samuelson* court, which held that the rational basis test applied to the Act. *Samuelson*, 189 Ill. 2d at 562.

### A. Persons Under the Code

■ Respondent contends that individuals under the Act are similarly situated to those individuals who are involuntarily committed under the Code and that individuals under the Code are given more rights than individuals under the Act. Respondent maintains, therefore, that the Act violates equal protection of the law.

Although the trial court found that individuals under the Act were similarly situated to those individuals under the Code, this finding was rejected by *Samuelson*, 189 Ill. 2d at 563-64. See also *In re Detention of Varner*, 315 Ill. App. 3d 626, 734 N.E.2d 226 (2000). Accordingly, we must conclude that individuals under the Act are not similarly situated to individuals under the Code.

### B. Persons Under the Sexually Dangerous Persons Act

■ Respondent next contends that persons under the Act are similarly situated to those persons under the Sexually Dangerous Persons Act. He contends there is no compelling difference between the two groups to warrant a difference in treatment, including the fact that a jury trial can be forced upon an individual under the Act, the Act withholds timely periodic reexaminations of an individual's mental condition,[5] and the Act limits a respondent's ability to petition the court for discharge.

Several cases, most of which are from the Second District, have

---

[4]The trial court's order certifying the questions is not contained in the record. The questions are taken from respondent's application for leave to appeal.

[5]This section was amended to provide for periodic reexaminations "at least once every 12 months from the completion of the last evaluation." Pub. Act 91—875, eff. June 30, 2000 (amending 725 ILCS 207/55 (West Supp. 1999)).

addressed this precise issue and all have held that individuals under the Act are not similarly situated to those individuals under the Sexually Dangerous Persons Act. See *In re Detention of Varner*, 315 Ill. App. 3d at 634; *People v. Winterhalter*, 313 Ill. App. 3d 972, 976-77, 730 N.E.2d 1158 (3d Dist. 2000); *People v. Coan*, 311 Ill. App. 3d 296, 298-99, 724 N.E.2d 1049 (2d Dist. 2000); *People v. McDougle*, 303 Ill. App. 3d 509, 523, 708 N.E.2d 482 (2d Dist. 1999); *People v. McVeay*, 302 Ill. App. 3d 960, 967-68, 706 N.E.2d 539 (2d Dist. 1999).

Although the court in *Samuelson* did not specifically address the issue, we believe it is reasonable to conclude that the supreme court would have reached the same conclusion as the two districts of this court in light of the *Samuelson* court's statements that there were far more specific criteria necessary to qualify as a sexually violent person under the Act than the criteria necessary to meet to qualify as a sexually dangerous person, and that if sexually dangerous individuals present different societal problems, the same is "surely true" of individuals who qualify as sexually violent persons. *Samuelson*, 189 Ill. 2d at 563-64.

While we are not bound by decisions of other districts, we find the analysis and rationale of the above cases instructive and hold that individuals under the Act are not similarly situated to individuals under the Sexually Dangerous Persons Act.

Based on the foregoing, we answer the first certified question in the negative.

## II. *Ex Post Facto* Law and Double Jeopardy

The second certified question we are asked to consider is:

"Whether the SVP Act is unconstitutional as applied to Respondent because the State is using it to impose punishment after making what it now regards as an improvident plea bargain in Respondent's criminal case, and when used in this manner the SVP Act constitutes an ex post facto law and violates the prohibition against double jeopardy[.]"

Respondent's argument respecting this question parallels the question. The trial court concluded that the Act was not an *ex post facto* law, nor did it violate double jeopardy because it was civil and not punitive in nature.

In *Hendricks*, defendant challenged the Kansas sexually violent predators act on double jeopardy and *ex post facto* grounds, alleging that the statute was "newly enacted 'punishment' " predicated on past conduct for which he had already been convicted and had served his sentence. *Hendricks*, 521 U.S. at 361, 138 L. Ed. 2d at 514, 117 S. Ct. at 2081. The *Hendricks* Court disagreed, finding that commitment under the Kansas statute did not implicate either of the two primary

objectives of criminal punishment, retribution or deterrence, and, therefore, the proceedings were civil. The *Hendricks* Court concluded that the goal of retribution was not implicated because the statute did not "affix culpability" for any prior criminal conduct. Rather, the Court determined that evidence of prior criminal conduct was admitted solely for the purpose of showing the defendant's mental condition and to predict his future behavior. *Hendricks*, 521 U.S. at 362, 138 L. Ed. 2d at 515, 117 S. Ct. at 2082. The *Hendricks* Court further stated that the goal of deterrence was not implicated because individuals under the Kansas statute suffer from mental problems which prevent them from being able to control their own behavior and, therefore, such persons were unlikely to be deterred by a threat of confinement. *Hendricks*, 521 U.S. at 362-63, 138 L. Ed. 2d at 515-16, 117 S. Ct. at 2082.

The *Hendricks* Court also found that although some of the criminal procedural safeguards were available to individuals under the Kansas statute, these safeguards did not render the statute criminal. Instead, it demonstrated that the State of Kansas was taking "great care to confine only a narrow class of particularly dangerous individuals." *Hendricks*, 521 U.S. at 364, 138 L. Ed. 2d at 517, 117 S. Ct. at 2083. Therefore, the Court held that the proceedings were not criminal and that involuntary confinement was not punitive, and, thus, because the confinement was not punitive, "an essential prerequisite for both Hendricks' double jeopardy and *ex post facto* claims" was missing. *Hendricks*, 521 U.S. at 369, 138 L. Ed. 2d at 519, 117 S. Ct. at 2085.

The *Hendricks* Court specifically stated with respect to the respondent's double jeopardy claim that because the proceedings were civil, initiation of the commitment proceeding was not a second prosecution. *Hendricks*, 521 U.S. at 369, 138 L. Ed. 2d at 519-20, 117 S. Ct. at 2086. The Court also found that because the commitment was not punishment, the involuntary detention did not violate double jeopardy "even though the confinement may follow a prison term." *Hendricks*, 521 U.S. at 369, 138 L. Ed. 2d at 520, 117 S. Ct. at 2086.

With respect to the *ex post facto* law challenge, the *Hendricks* Court stated that this principle applies only to penal statutes (*Hendricks*, 521 U.S. at 370, 138 L. Ed. 2d at 520, 117 S. Ct. at 2086), and because the Kansas statute did not impose punishment, it did not raise *ex post facto* concerns. *Hendricks*, 521 U.S. at 370-71, 138 L. Ed. 2d at 520-21, 117 S. Ct. at 2086. Further, there was no retroactive effect because the confinement was based on one's current mental condition, not his or her past conduct. *Hendricks*, 521 U.S. at 371, 138 L. Ed. 2d at 520, 117 S. Ct. at 2086.

Similarly, although the exact argument raised by respondent was not addressed in *Samuelson*, the *Samuelson* court concluded that because the Act was civil and the confinement was not punishment, the Act was not subject to double jeopardy or *ex post facto* challenges. *Samuelson*, 189 Ill. 2d at 559. See also *In re Detention of Varner*, 315 Ill. App. 3d at 637 (summarily dismissing the respondent's double jeopardy and *ex post facto* challenges based on *Samuelson*); *Winterhalter*, 313 Ill. App. 3d 975 (summarily rejecting the defendant's *ex post facto* challenge based on *Samuelson*).

We, too, summarily reject respondent's argument. The fact that the State may have been unhappy with the plea results is irrelevant to whether respondent is a sexually violent individual requiring treatment. See *In re Hay*, 263 Kan. 822, 834, 953 P.2d 666, 676 (1998) (court rejected the defendant's argument that commitment violated his plea agreement; the "plea agreement is immaterial as far as proceedings under the Act are concerned" where the commitment is based on a defendant's mental ailment and present dangerousness). Because the proceedings are civil, respondent is not being subjected to greater punishment. Similarly, because the Act is not punitive, there is no basis for double jeopardy or *ex post facto* challenges.

Based on the foregoing, we answer the second certified question in the negative.

### III. Substantive Due Process

The third certified question we are asked to consider is:

"Whether the SVP Act violates substantive due process because the categories of 'mental disorder,' which has neither a clinically significant meaning nor a recognized diagnostic use, and 'substantial probability,' which is not defined or quantified in any fashion, are too imprecise, vague and manipulable to provide a legitimate basis for incarceration[.]"

Respondent contends that because "mental disorder" and "substantial probability"[6] are imprecise, vague, and manipulable terms, the Act violates substantive due process. Respondent also contends that the Illinois Constitution provides greater due process rights than the federal constitution. The trial court concluded that the Act did not violate substantive due process because the term "mental disorder" is an accepted and specific term. Further, it determined that the term "substantial probability" meant "considerably more likely than not to occur" and that the prediction of further dangerousness was attainable.

---

[6] We note that respondent utilizes the term "substantial probability" in his brief, whereas the statute uses the term "substantially probable." However, for reasons identified later, we find no significant difference.

Initially, respondent asks us to construe the due process clause of the Illinois Constitution more expansively than the federal counterpart. He relies on *Heimgaertner v. Benjamin Electric Manufacturing Co.*, 6 Ill. 2d 152, 128 N.E.2d 691 (1955), to support his contention that the Illinois Supreme Court has done so in the past. *Heimgaertner* does not support respondent's position. First, the court in *Heimgaertner* did not specifically state that the Illinois due process clause provides more protection than the federal due process clause. Second, in addressing the issue before it, the court did not discuss the federal clause at all, nor did it compare it to the Illinois clause. Therefore, this case is not controlling.

■ While we may construe our constitutional due process clause more expansively than the federal clause, we are to do so only when the debates and committee reports of the Constitutional Convention demonstrate that the framers intended a different construction. *People v. DiGuida*, 152 Ill. 2d 104, 118, 604 N.E.2d 336 (1992). Respondent has offered no convincing rationale or reason for doing so in the instant case. In fact, he has offered no reason at all. Also, respondent has failed to provide any basis from which to conclude that the framers intended to interpret the standards under Illinois law differently than under the federal clause. See, *e.g.*, *People v. Emerson*, 189 Ill. 2d 436, 469, 727 N.E.2d 302 (2000). Accordingly, we decline to construe the Illinois Constitution more broadly than its federal counterpart.

## A. Mental Disorder

■ With respect to the term "mental disorder," respondent contends that the term has no clinically significant meaning nor is there any recognized diagnostic use. Respondent further argues that the Act does not set forth any standards for making such a finding or diagnosis, and that the term simply has no meaning and there is nothing to link sex offenders with mental disorders.

In *Hendricks*, the defendant argued that the term "mental abnormality" as used in the Kansas sexually violent predators act violated due process because it was "coined by the Kansas Legislature, rather than by the psychiatric community," and the term was not sufficient to meet the requirements for "mental illness" which is necessary for involuntary commitment. *Hendricks*, 521 U.S. at 358-59, 138 L. Ed. 2d at 513, 117 S. Ct. at 2080. "Mental abnormality" was defined by the Kansas statute as a " 'congenital or acquired condition affecting the emotional or volitional capacity which predisposes the person to commit sexually violent offenses in a degree constituting such person a menace to the health and safety of others.' " *Hendricks*, 521 U.S. at 352, 138 L. Ed. 2d at 509, 117 S. Ct. at 2077, quoting Kan.

Stat. Ann. § 59—29aO2(b) (1994). The *Hendricks* Court rejected the respondent's argument, finding that there was no agreement among professionals on exactly what is a mental illness. Further, the Court noted that the Court itself had used various terms to describe the mental condition of those subject to civil commitment. *Hendricks*, 521 U.S. at 359, 138 L. Ed. 2d at 513, 117 S. Ct. at 2080. The Court also refused to require that terms be defined only by the medical profession, stating:

"Indeed, we have never required state legislatures to adopt any particular nomenclature in drafting civil commitment statutes. Rather, we have traditionally left to legislators the task of defining terms of a medical nature that have legal significance. [Citation.] As a consequence, the States have, over the years, developed numerous specialized terms to define mental health concepts. Often, those definitions do not fit precisely with the definitions employed by the medical community." *Hendricks*, 521 U.S. at 359, 138 L. Ed. 2d at 513, 117 S. Ct. at 2081.

Further, in a footnote, the Court stated: "As we have explained regarding congressional enactments, when a legislature 'undertakes to act in areas fraught with medical and scientific uncertainties, legislative options must be especially broad and courts should be cautious not to rewrite legislation.' [Citation.]" *Hendricks*, 521 U.S. at 360 n.3, 138 L. Ed. 2d at 514 n.3, 117 S. Ct. at 2081 n.3. Accordingly, the *Hendricks* Court held that the term "mental abnormality" was sufficient for due process purposes. *Hendricks*, 521 U.S. at 360, 138 L. Ed. 2d at 514, 117 S. Ct. at 2081.

In *Winterhalter*, the defendant contended that the Act violated substantive due process because the term "mental disability" was too broad, vague, and manipulable. The *Winterhalter* court rejected this argument, finding that identical statutory language was challenged in *Hendricks* which the *Hendricks* court found passed constitutional muster. While the defendant in *Winterhalter* contended that the Illinois Constitution provided more expansive due process protection than the federal constitution, the court declined to define the Illinois due process clause more expansively, stating that the defendant provided no authority to support his contention. *Winterhalter*, 313 Ill. App. 3d at 977.

The Act here defines "mental disorder" as "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence." 725 ILCS 207/5(b) (West 1998). As the *Winterhalter* court pointed out, the term interpreted by the Supreme Court in *Hendricks* is almost identical to our definition. Keeping in mind that the areas of psychiatry and

psychology are "fraught" with disagreement, we find that the term "mental disorder" has sufficient clarity to identify who may fall within the Act. While respondent here contends that he presented expert opinions that there is no clinically significant meaning or recognized diagnostic use for the term, the State presented its own expert opinions and evidence to the contrary.

Based on the foregoing, we reject respondent's argument.

## B. Substantially Probable

With respect to the term "substantially probable," respondent contends there is no evidence that future sexual offenses can be accurately predicted. Respondent maintains that, according to much of the evidence he presented to the trial court, predictions are wrong more often than not. He also contends that the term requires no quantification of prediction testimony and there is no generally accepted definition for the term. Respondent further contends that the trial court erred in relying on a Wisconsin appellate court's definition of a similar term based upon dictionary definitions.

The trial court in addressing this argument found that the term "substantially probable" was sufficiently narrow to satisfy due process. The trial court relied on United States Supreme Court precedent to conclude that future conduct can be predicted. It then relied upon a Wisconsin appellate court case to define the term "substantially probable" to mean "considerably more likely than not to occur."

None of the cases addressing the constitutionality of the Act have addressed the issue of whether the term "substantially probable" is sufficiently narrow to meet a due process challenge.

With respect to the lack of ability to predict future conduct, we reject respondent's argument. Although it is true that respondent presented abundant evidence to demonstrate that future conduct is not predictable or prediction is unreliable, the State also presented expert testimony to the contrary. Further, as the trial court noted, the United States Supreme Court has indeed held that such predictions can be made and pass constitutional muster. See *Barefoot v. Estelle*, 463 U.S. 880, 897-903, 77 L. Ed. 2d 1090, 1106-110, 103 S. Ct. 3383, 3396-99 (1983); *Jurek v. Texas*, 428 U.S. 262, 274-75, 49 L. Ed. 2d 929, 940, 96 S. Ct. 2950, 2957-58 (1976); see also *Estelle v. Smith*, 451 U.S. 454, 473, 68 L. Ed. 2d 359, 375-76, 101 S. Ct. 1866, 1878 (1981).

With respect to the issue of vagueness, the trial court relied on *State v. Kienitz*, 221 Wis. 2d 275, 585 N.W.2d 609 (App. 1998), *aff'd*, 227 Wis. 2d 423, 597 N.W.2d 712 (1999). Although respondent argues that the trial court's reliance on this case was erroneous because the Wisconsin court relied upon dictionary definitions to define the term,

we disagree. Dictionary definitions are often employed to define terms that are undefined by a statute. See *In re A.P.*, 179 Ill. 2d 184, 198-99, 688 N.E.2d 642 (1997) (utilizing Black's Law Dictionary to define "corroborate"); *People v. Butler*, 304 Ill. App. 3d 750, 758, 709 N.E.2d 1272 (1999) (utilizing Webster's Third New International Dictionary to define "mixture" and "substance").

Although the trial court relied upon the *Kienitz* appellate court case, the Wisconsin Supreme Court has now addressed the definition of "substantially probable." In *In re Commitment of Curiel*, 227 Wis. 2d 389, 597 N.W.2d 697 (1999), a companion case to *Kienitz*, the Wisconsin Supreme Court concluded that the term "substantially probable," construed according to its common and appropriate usage, meant "much more likely than not." *Curiel*, 227 Wis. 2d at 395, 597 N.W.2d at 700. The *Curiel* court further concluded that the term was not unconstitutionally vague. *Curiel*, 227 Wis. 2d at 395, 597 N.W.2d at 700.

As in the instant case, the *Curiel* respondent identified the term as "substantial probability" rather than "substantially probable." However, the *Curiel* court found no difference between the two and stated that its interpretation of "substantially probable" served equally as an interpretation of "substantial probability." *Curiel*, 227 Wis. 2d at 403, 597 N.W.2d at 703.

With respect to the *Curiel* court's interpretation of the word "probable" to mean "more likely than not" (*Curiel*, 227 Wis. 2d at 405, 597 N.W.2d at 704), the court considered the following dictionary definitions:

> "The American Heritage Dictionary defines 'probable' as an adjective meaning: '1. Likely to happen or to be true: *War seemed probable in 1938. The home team, far ahead, is the probable winner.* 2. Likely but uncertain; plausible.' *The American Heritage Dictionary of the English Language* at 1443 (3d ed. 1992)." 227 Wis. 2d at 405, 597 N.W.2d at 704.

In interpreting these definitions, the court stated:

> "The common sense of 'probable' in both of these definitions is that there is a greater likelihood that an event will happen than that it will not happen: that is, that it is more likely than not that the event will happen." *Curiel*, 227 Wis. 2d at 405, 597 N.W.2d at 704.

The *Curiel* court then considered the definitions provided by Black's Law Dictionary, *i.e.*:

> " '[P]robable' is defined as '[h]aving more evidence for than against' and 'probability' is defined as 'a condition or state created when there is more evidence in favor of the existence of a given

proposition than there is against it.' *Black's Law Dictionary* at 1201 (6th ed. 1990)." *Curiel*, 227 Wis. 2d at 405, 597 N.W.2d at 704. With respect to the word "substantially," the *Curiel* court noted that there were numerous definitions provided by various dictionaries. However, it concluded:

> "[T]he term as used in ch. 980 [sexually violent act] is '[c]onsiderable in importance, value, degree, amount, or extent: *won by a substantial margin.*' *The American Heritage Dictionary of the English Language* at 1791. A word which commonly denotes this sense of 'substantially' is the term 'much,' defined as '[g]reat in quantity, degree, or extent.' *Id.* at 1183." *Curiel*, 227 Wis. 2d at 405-06, 597 N.W.2d at 704.

Again, the *Curiel* court ultimately concluded that "substantially probable" meant "much more likely than not." *Curiel*, 227 Wis. 2d at 406, 597 N.W.2d at 705.

In construing statutes, our goal is to give effect to the legislature's intent. *A.P.*, 179 Ill. 2d at 195. The best evidence of the legislature's intent is the language of the statute itself. *A.P.*, 179 Ill. 2d at 195. Where a statute does not define a term, we must rely on its plain and ordinary meaning. *A.P.*, 179 Ill. 2d at 198-99. The court may look to dictionary definitions to derive the plain and ordinary meaning without rendering the term ambiguous. See *A.P.*, 179 Ill. 2d at 199.

As the statutory language in *Curiel* is identical to the statutory language in the Act,[7] we find the Wisconsin court's analysis persuasive and agree with its definition of "substantially probable." Accordingly, the term is not so vague that "persons of common intelligence must necessarily guess at either its meaning or its application." *People v. Falbe*, 189 Ill. 2d 635, 640, 727 N.E.2d 200 (2000). See also *People v. Reynolds*, 294 Ill. App. 3d 58, 68, 689 N.E.2d 335 (1997).

Based on the foregoing, we answer the third certified question in the negative.

### IV. Procedural Due Process—Jury Trial

■ The fourth certified question we are asked to consider is:

> "Whether the SVP Act, which gives the State the right to force a Respondent to a jury trial in an initial commitment proceeding, is a

---

[7]In *Curiel*, the Wisconsin statute provided that a person "is dangerous because he or she suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence." Wis. Stat. § 980.01(7) (1998). Illinois' Act states that a person "is dangerous because he or she suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence." 725 ILCS 207/5(f) (West 1998).

violation of procedural due process because the presentation of sexual[-]propensity evidence to a lay jury compromises the integrity and accuracy of the fact-finding process, creating an unacceptable risk that the Respondent will be erroneously deprived of liberty[.]"

Respondent contends that the Act violates his right to procedural due process because the presentation of sexual-propensity evidence to a jury will compromise the accuracy and integrity of the fact-finding process. According to respondent, the jury is likely to overvalue the evidence and it may vote to "convict" respondent because he or she is a bad person.

The State argues that the principles respondent relies upon relate to criminal proceedings and are inapplicable here because this is a civil proceeding. Further, in proceedings under the Act, the fact finder must determine the existence of a prior offense in order to determine whether a respondent falls within the definition of a sexually dangerous person. Thus, evidence of prior acts is necessary. The State compares the function of the trier of fact in proceedings under the Act to a sentencing jury's function.

In response to the State's arguments, respondent contends that the State has mischaracterized his argument. Respondent argues he is not simply objecting to propensity evidence but rather is objecting to the fact that such evidence "engenders many other dangers in a jury trial, distinct and apart from the concern that a jury will convict because [it] fears the respondent may commit offenses in the future." It is respondent's position that these other dangers will infect the proceedings and render them unreliable. Respondent identifies the danger as the jury finding against a respondent because it wants to punish him or her for past criminal conduct and the danger that the presumption of innocence "quickly [is] converted into [a] presumption of guilt" when propensity evidence is presented because of the public's negative attitude towards sex crimes.

Section 35 of the Act provides that either the respondent, the Attorney General, or the State's Attorney may request that a trial be by a jury. 725 ILCS 207/35(c) (West 1998). In the paragraph preceding this provision, the legislature has given to respondents "[a]ll constitutional rights available to a defendant in a criminal proceeding." 725 ILCS 207/35(b) (West 1998).[8]

In *Samuelson*, the respondent challenged section 35 on the basis

---

[8]This section has recently been amended. Following the statement that respondents are provided all constitutional rights, the legislature added the following sentence: "At the trial on the petition it shall be competent to introduce evidence of the commission by the respondent of any number of

that it denied him his right to waive a jury trial. The *Samuelson* court rejected this argument, holding that because proceedings under the Act were civil, and because the rule allowing a defendant an unfettered right to be tried by a judge related only to criminal proceedings, such a rule did not apply to respondents under the Act. *Samuelson*, 189 Ill. 2d at 560.

While respondent frames the issue differently than the respondent did in *Samuelson*, respondent's ultimate contention is:

> "Procedural due process dictates that when the State is allowed to present prior acts of sexual misconduct on a propensity theory of logical relevance, *there must be a provision for the case to be tried before a neutral, detached and trained judicial officer* as a safeguard against the otherwise devastating effects of [*sic*] sexual-propensity evidence has on the jury in the fact-finding process." (Emphasis added.)

In effect, respondent is arguing that he has a right to waive a jury trial but simply relies on a different basis for his argument. *Samuelson* rejected the same argument that a respondent has a right to a jury trial and, therefore, respondent's argument here fails.

In any event, we conclude that admission of sexual-propensity evidence is proper. The *Hendricks* Court implicitly approved the introduction of prior conduct or "bad acts" evidence, stating that evidence of the prior criminal conduct was " 'received not to punish past misdeeds, but primarily to show the accused's mental condition and to predict future behavior.' " *Hendricks*, 521 U.S. at 362, 138 L. Ed. 2d at 515, 117 S. Ct. at 2082, quoting *Allen v. Illinois*, 478 U.S. 364, 371, 92 L. Ed. 2d 296, 306, 106 S. Ct. 2988, 2993 (1986). Further, as the State points out, evidence of respondent's sexual offense which forms the basis for his commitment must be shown by the State to meet its burden under the Act.

Our independent research has revealed 10 other jurisdictions that allow the State or Attorney General to seek a jury trial; four of these jurisdictions also allow the trial judge to request a jury trial. None of these statutory provisions have been challenged on the constitutional grounds raised by respondent. However, in *Hay*, while not addressing admission of other crimes evidence on a constitutional level, the court did address the propriety of admitting such evidence. The *Hay* court rejected the defendant's contention that such evidence is not admissible. In reaching its decision, the *Hay* court stated that the State is required to show that the defendant was convicted of or charged with

---

crimes together with whatever punishments, if any, were imposed." Pub. Act 91—875, eff. June 30, 2000 (amending 725 ILCS 207/35(b) (West 1998)).

a sexual offense. The *Hay* court also stated that such evidence was "clearly relevant to prove [the defendant] suffers from the condition of pedophilia and that he is likely to engage in predatory acts of sexual violence in the future." *Hay*, 263 Kan. at 837, 953 P.2d at 677. Accordingly, the *Hay* court held that such evidence was admissible because it was an essential element of the required proof and necessary to the "decision-making process of the jury." *Hay*, 263 Kan. at 837, 953 P.2d at 677.

Further, according to *Hay*, even though the evidence may have been prejudicial to the defendant, it was probative of the ultimate issue the jury was required to determine, *e.g.*, whether the defendant was a sexually violent person. The court then distinguished the rule in criminal cases prohibiting evidence of other crimes because in those situations such evidence is being used in a later unrelated trial to infer that the defendant committed the crime for which he is currently charged. The *Hay* court also noted that it had approved the admission of other crimes evidence where such evidence is independently admissible. Lastly, the court considered a Washington case where the court stated that " 'prior sexual history is highly probative of [a respondent's] propensity for future violence.' " *Hay*, 263 Kan. at 838, 953 P.2d at 678, quoting *In re Personal Restraint of Young*, 122 Wash. 2d 1, 53, 857 P.2d 989, 1015 (1993). Thus, the *Hay* court ultimately concluded that because other crimes evidence was relevant to the crucial issue in sexual predator cases, evidence of prior conduct, whether charged or uncharged, was material evidence. *Hay*, 263 Kan. at 838, 953 P.2d at 678.

In Illinois, while evidence of other crimes is generally inadmissible (*People v. Colon*, 162 Ill. 2d 23, 31, 642 N.E.2d 118 (1994)), it is admissible if relevant to show intent (*People v. Banks*, 161 Ill. 2d 119, 138, 641 N.E.2d 331 (1994)), knowledge (*People v. Alexander*, 93 Ill. 2d 73, 79, 442 N.E.2d 887 (1982)), motive (*Banks*, 161 Ill. 2d at 138), absence of mistake or accident (*Estelle v. McGuire*, 502 U.S. 62, 68, 116 L. Ed. 2d 385, 396, 112 S. Ct. 475, 480 (1991)), identity (*People v. Coleman*, 158 Ill. 2d 319, 335, 633 N.E.2d 654 (1994)), common scheme, plan, or design (*People v. Armstrong*, 41 Ill. 2d 390, 399, 243 N.E.2d 825 (1968)), or *modus operandi* (*People v. Jones*, 156 Ill. 2d 225, 240, 620 N.E.2d 325 (1993)). Although such evidence is not automatically admissible, it is admissible if the State requires such evidence to establish its burden of proof. *People v. Cole*, 29 Ill. 2d 501, 504-05, 194 N.E.2d 269 (1963). Moreover, such evidence is routinely admitted at sentencing hearings. *People v. Jackson*, 200 Ill. App. 3d 92, 100, 557 N.E.2d 1282 (1990).

Although sexual-propensity evidence may be prejudicial, it is none-

theless clearly relevant to proceedings under Illinois' Act, *i.e.*: it is material to the State's burden of proving that the respondent has committed a sex offense; prior conduct may be relevant to whether the respondent suffers from a mental disorder; and, such evidence is relevant to whether it is substantially probable that the respondent will commit further acts of sexual violence. 725 ILCS 207/15 (West 1998).

Based on the foregoing, we conclude that admission of propensity evidence does not deny a respondent's due process right. Accordingly, we answer the fourth certified question in the negative.

## V. Procedural Due Process—Petition Clause of First Amendment

The fifth certified question we are asked to consider is:

"Whether the Act's post-commitment discharge procedures violate the petition clause of the First Amendment to the United States Constitution and Article I, Section 5 of the Illinois Constitution[.]"

Respondent contends that the Act violates the petition clause of the first amendment because it has a chilling effect on the right to petition for discharge since the Act penalizes a respondent for filing a petition for discharge without the approval of the Secretary of the Department and the Act provides no standards for granting such approval. Respondent further argues that the postcommitment process is facially overbroad because it penalizes a respondent for filing a petition that is not successful. The State contends that various avenues are available for discharge procedures which are more than adequate to protect respondent's rights. The trial court summarily dismissed this issue.

In *Varner*, this identical argument was presented and rejected by the court. The *Varner* respondent challenged the Act on procedural due process grounds, contending that it limited a respondent's right to petition for discharge, it penalized a respondent for filing a petition for discharge without the Secretary of the Department of Human Services' approval, and there were no standards for the Department's approval. In ruling on the respondent's contentions, the court applied the following three-part analysis: (1) whether a liberty or property interest had been interfered with by the State; (2) whether there was a risk of an erroneous deprivation of such an interest through already-existing procedures, while considering the value of additional safeguards; and (3) whether the State would suffer an administrative and monetary burden. *Varner*, 315 Ill. App. 3d at 635. The *Varner* court found that the first element was certainly fulfilled.

The *Varner* court next noted that the Act provides several safeguards to ensure that those respondents who are no longer sexually violent do not remain confined. The Act provides for three

mechanisms to obtain a discharge, it provides for the retention or appointment of an expert or professional for evaluation, and it provides that the court itself may, at any time, order a reexamination of the respondent. Based on the mechanisms available, the *Varner* court concluded that the risk of a respondent being erroneously confined was slight. *Varner*, 315 Ill. App. 3d at 636. With respect to the fact that the Act requires approval by the Secretary of the Department and there are no standards for approval, the *Varner* court stated that this applies only to those individuals who have previously filed a petition without approval and where the court has determined that the petition was frivolous or that the respondent was still sexually violent. The *Varner* court further observed that the Act does not limit the number of petitions that a respondent may file, nor does it contain a time limitation. Rather, the Act simply does not require a full evidentiary hearing on each petition. The *Varner* court reasoned that the extra costs associated with an evidentiary hearing on every petition for discharge would be high in comparison to the protection such a hearing would provide. *Varner*, 315 Ill. App. 3d at 636. Accordingly, the *Varner* court held that the "Act provides sufficient safeguards to ensure that committed persons who are no longer sexually violent are discharged." *Varner*, 315 Ill. App. 3d at 637. We find the analysis and reasoning in *Varner* persuasive and similarly reject respondent's argument here.

Based on the foregoing, we answer the fifth certified question in the negative.

## CONCLUSION

We answer each of the certified questions in the negative and hold that the Act is not unconstitutional on the bases raised by respondent.

Certified questions answered in the negative.

HALL, P.J., and WOLFSON, J., concur.