2019 IL App (1st) 180881
No. 1-18-0881
Opinion filed September 23, 2019

First Division

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | |
|---|---|
| *In re* COMMITMENT OF EDWARD GAVIN, | ) |
| | ) Appeal from the |
| (The People of the State of Illinois, | ) Circuit Court of |
| | ) Cook County. |
| Petitioner-Appellee, | ) |
| | ) No. 06 CR 80009 |
| v. | ) |
| | ) Honorable |
| Edward Gavin, | ) Steven G. Watkins, |
| | ) Judge, presiding. |
| Respondent-Appellant.) | ) |

JUSTICE HYMAN delivered the judgment of the court, with opinion.
Justices Pucinski and Coghlan concurred in the judgment and opinion.

**OPINION**

¶ 1    In 2012 a Cook County jury found Edward Gavin to be a sexually violent person as defined in the Sexually Violent Persons Commitment Act (SVP Act) (725 ILCS 207/1 *et seq.* (West 2010)). We reversed and remanded for a new trial in light of improper statements the State made during the trial. *In re Commitment of Gavin*, 2014 IL App (1st) 122918. On remand, after a bench trial, Gavin was still categorized as a sexually violent person and ordered committed. Gavin argues that the State failed to prove him a sexually violent person (SVP) beyond a

reasonable doubt on two grounds: (i) the State failed to prove that he currently suffers from a mental disorder that predisposes him to acts of sexual violence, and (ii) the State failed to prove that any mental disorder he does have creates a substantial probability that he will commit more acts of sexual violence. Alternatively, Gavin argues that we should reverse and remand for a new trial on two grounds: (i) the trial court committed error by equating the "substantially probable" standard with a "more likely than not" standard, and (ii) the trial court erred by allowing the State to elicit testimony that Gavin had a 100% chance of reoffending between his third and fourth criminal offense. We disagree, and affirm.

¶ 2                                    Background

¶ 3     Our earlier opinion summarizes the evidence introduced at Gavin's first trial. *Gavin*, 2014 IL App (1st) 122918, ¶¶ 5-8, 13-23. The State's experts, Dr. Vasiliki Tsoflias and Dr. Kimberly Weitl, gave substantially similar testimony at Gavin's second trial. We go into some detail, however, because Gavin's first appeal did not raise the question of reasonable doubt and the second trial, unlike the first, included a report and testimony from Gavin's expert, Dr. Brian Abbott.

¶ 4                              Gavin's Sexual Offenses

¶ 5     Aside from one certified statement of conviction for a 1988 case, the record contains no documentary evidence setting out Gavin's criminal history. But all three experts provided consistent information about his offenses. We also explain the details of some of those offenses because the underlying facts relate to the experts' conclusions.

¶ 6     Gavin was convicted of an attempted rape when 17 years of age. The victim, also age 17, entered an elevator in a Chicago Housing Authority (CHA) building. Once the elevator started

moving, Gavin pushed the victim down, ripped her shirt open, and fondled her breasts. The victim resisted and ran to a friend's apartment. Gavin self-reported the incident to Dr. Weitl as consensual sex inside the victim's apartment. He self-reported to Dr. Abbott "that he had a couple of drinks and saw the victim, he thought she looked good, and he couldn't resist himself and he acted out on his urges and touched her breasts." Gavin received a sentence of two to six years in the Department of Corrections.

¶ 7 On the same day as the attempted rape, in the same CHA building, Gavin got on the elevator with a 14-year-old girl. When the girl tried to leave the elevator, Gavin pulled her back in, stopped the elevator between floors, and "physically overpowered her and vaginally raped her." Somebody heard her screaming and called the police. Gavin self-reported to Dr. Weitl that he and the victim had consensual sex in the elevator. To Dr. Abbott, Gavin reported "that he was in the elevator with the victim, the elevator got stuck, he and the victim had consensual sex, and that she stated that he raped her because when they got out of the elevator somebody saw him and told her boyfriend." Gavin received a sentence of four to six years in the Department of Corrections.

¶ 8 While on parole for his earlier offenses, Gavin was convicted of an attempted rape at the same CHA building; Gavin (now 21) grabbed the 15-year-old victim on the thirteenth floor of the building and pulled her down to the ninth floor, where he attempted to sexually assault her. People heard the victim screaming and called the police. When officers arrived they "had to physically hit Mr. Gavin over the head with their guns in order to get him off the victim." Gavin gave an account to someone in the Department of Corrections in 1980 that differed substantially from the official version. Great detail is not necessary, but Gavin essentially relayed that he and

several of his friends had received permission from the victim's boyfriend to take turns having sex with her. Gavin reported to Dr. Abbott that the victim "had a reputation for sleeping with many people" and claimed the victim only alleged rape because she did not want her mother to find out about her sexual activity. Gavin received a 12-year sentence in the Department of Corrections.

¶ 9      After serving that sentence and again on parole, Gavin vaginally raped a cleaning lady at a motel. After staring at her through a window, Gavin came into the room and "displayed a block of wood and acted as if it was a gun," raped her, and went through her purse looking for money. Gavin self-reported to three doctors about this incident. The first time he reported he explained that he had hired two prostitutes to have sex with him (we use the word "prostitute" because that is the term used during the expert testimony; less stigmatizing modern parlance would be "sex worker"). They left when they found out he did not have any money, and so he raped the maid in anger. The second time he reported he explained that he had sex with the prostitutes but got mad when they left, and so "his first thought was the maid and he found the maid and he raped her." The third time he reported he explained that he hired the two prostitutes but did not have sex with them because he was experiencing erectile dysfunction. He got mad when the prostitutes left and, still frustrated, "he found the maid and forced her to have sex with him." Gavin received a sentence of 15 years in the Department of Corrections.

¶ 10                      Gavin's In-Custody Discipline

¶ 11   Throughout his periods in custody, Gavin frequently found himself in trouble. On December 29, 1984, while in custody at an unspecified facility, he received a sexual misconduct ticket that carried a punishment of 30 days in segregation and a revocation of 30 days of good

time credit. The details of Gavin's actions leading to this ticket were unknown to the expert witnesses.

¶ 12    During November 1989 and January 1990, Gavin received four sexual misconduct tickets at the Illinois River Correctional Center. The first incident involved Gavin touching his genitals while meeting with a female doctor. The second incident arose when Gavin told a female staff member that he loved her after asking about her marital status and whether she would be in a relationship with him. Next, Gavin exposed himself to a nurse and refused to put on a medical gown while in the infirmary. The fourth incident occurred after Gavin again refused to cover up while in the infirmary. This incident caused the Department of Corrections to transfer him to Danville Correctional Center.

¶ 13    On August 27, 1991, while at Danville, Gavin committed another sexual misconduct violation. Gavin went into the office of a female vocational counselor. After he disobeyed her request to leave, she called security. Gavin threw the phone on the floor, then threw the counselor on the floor and started to kiss her. She coaxed Gavin off of her and ran to the next room. Gavin followed and again pushed her on the floor and started fondling her breasts. Another correctional officer arrived but needed assistance to pull Gavin off of the vocational officer. As a result of this attack, Gavin was transferred to Menard Correctional Center, a maximum security facility. While he was at Menard, he received discipline for sexual misconduct in May 2001, after staring at a female correctional officer to the point where it made her uncomfortable.

¶ 14    Gavin also committed several rule violations while in temporary detention in the Department of Human Services (DHS). In 2007, he was found in possession of marijuana and a

bong. About a week later, authorities discovered he possessed three video tapes containing pornography. When asked about the tapes, Gavin told a DHS counselor that he had an addiction to pornography and could not promise he would not look at the tapes again. Gavin possessed pornography again in 2013, this time 10 DVDs, 42 images, and a hard drive "that contained more than 300 hours of pornography." During another incident the same year, Gavin threatened a DHS employee with a cane and then pushed the staff member, leading to other residents of the DHS facility to make threats of their own.

¶ 15                                        Expert Conclusions

¶ 16    Dr. Tsoflias concluded, to a reasonable degree of psychological certainty, that a substantial probability existed that Gavin will engage in future acts of sexual violence. She recommended finding Gavin an SVP under the SVP Act, as she had recommended at Gavin's first trial.

¶ 17    Dr. Tsoflias diagnosed Gavin with "Other Specified Paraphilic Disorder," specifically "[s]exually attracted to non-consenting females." She also diagnosed "Other Specified Personality Disorder, with Antisocial Features." To arrive at those diagnoses, she relied on the Diagnostic and Statistical Manual 5 (DSM-5), which defines a paraphilia as "any intense and persistent sexual interest other than sexual interest in genital stimulation or preparatory fondling with phenotypically normal, physically mature, consenting human partners." Paraphilic disorders involve paraphilias that are "currently causing distress or impairment to the individual, or a[re] pharaphilia[s] whose satisfaction has entailed personal harm, or risk o[f] harm, to others." Gavin's diagnosis, "Other Specified Paraphilic Disorder," describes "presentations in which symptoms characteristic of a paraphilic disorder *** dominate, but do not meet the full criteria

for any of the eight disorders specifically listed in the paraphilic disorders diagnostic class." Gavin's diagnosis "is not specifically listed in the DSM-5."

¶ 18    Gavin's "long-standing behavior for at least 16 years" supported Dr. Tsoflias's diagnosis. She pointed out that he "continually engaged in sexual assaults against nonconsenting women" during which "[t]he pattern was the same in that he isolated the women, he overpowered them physically, he physically assaulted them." During Dr. Tsoflias's testimony, the State asked what Gavin's risk of recidivism was between his third and fourth criminal offense. Dr. Tsoflias responded: "So his risk at that point would have been, I could say that it was 100 percent because he reoffended." During defense counsel's examination of Dr. Tsoflias, this exchange took place:

"Q. So you're not saying that when he was released after his third offense that his risk at that time was 100 percent, right?

A. No, I'm not saying that that was his static risk. I'm saying in hindsight, looking backwards, it was 100 percent likely that he—it was 100 percent that he offended."

Dr. Tsoflias further noted evidence of nonconsenting paraphilia because Gavin had consenting sexual partners available to him in the community "but he still chose to sexually assault different women."

¶ 19    Dr. Tsoflias also concluded that Gavin currently suffers from his paraphilia because paraphilias like Gavin's are "chronic in nature. They don't just go away. So the fact that you have a paraphilia indicates that you always have that paraphilia in terms of that sexual interest. The intensity of the paraphilia may increase and decrease, but it's not something that ever goes away." On cross-examination she explained that the DSM-5 only describes certain paraphilias

that way but that, in "all [her] training, [she has] learned that parahilias are chronic and lifelong." She indicated that, because Gavin "acted out sexually while in prison" and "has been found to be in possession of very high levels of pornography," evidence exists that he remains "preoccupied by sexuality, by sexual behavior towards women" and that this preoccupation is strong.

¶ 20    Gavin's offending while in custody indicated an inability to control his sexual behavior even when in a controlled environment. For example, Dr. Tsoflias drew a connection between the incident where officers had to hit Gavin to get him off the victim and the incident at Danville where a correctional officer and others had to remove Gavin from his victim. She concluded that his in-custody behavior "shows his inability to control his urges and that at that point he is so into what he's—into the offense that he's attempting to commit that even the presence of a correctional officer will not stop him."

¶ 21    Using various actuarial instruments, Gavin scored in a "well above average risk category." According to one of the instruments, this means Gavin "is 7.3 times more likely to engage in sexual reoffending than the average sex offender." According to the other instrument, Gavin is "3.6 times as likely than the average sex offender" to engage in sexual acts. Dr. Tsoflias also found that Gavin had several risk factors known as "dynamic risk factors," which are factors that can change through treatment. Gavin had a risk of sexual deviance—an interest in sexualized violence. And he exhibited a lack of intimate relationships with adults and poor cognitive problem solving. Finally, he resisted rules and supervision, as evidenced by his acting out in both Department of Corrections and DHS custody.

¶ 22    Dr. Tsoflias explained the absence of protective factors, which, if present, decrease a person's risk to reoffend. Gavin had not been in the community for a significant time without

reoffending, and while in custody, he had not completed cognitive behavioral treatment. Based on life expectancy statistics, Gavin would have more than 15 years of opportunity to reoffend once released based on his age of 58 and the average life expectancy of 76 years for the average African American male. This was true despite Gavin's many medical issues, as all of those issues were being successfully managed with treatment.

¶ 23   Dr. Weitl agreed that Gavin "met the criteria as a sexually violent person as defined by Illinois law." Like Dr. Tsoflias, Dr. Weitl looked at Gavin's criminal history and found evidence of "nonconsensual behavior, forcing sex on females, using physical violence beyond what he would have needed *** making statements that women are sexual objects, little less than human, he can take sex if he wants to." Dr. Weitl, referring to the incident with the maid at the hotel, explained that Gavin's actions indicated "it was the nonconsensual sex that was arousing to him." Dr. Weitl concluded that Gavin's history, both in and out of custody, showed he (i) lacks control; (ii) "can't follow directives when he's caught"; (iii) has little regard for women; and (iv) minimizes, denies, and otherwise fails to take accountability for his actions.

¶ 24   Based on these observations, Dr. Weitl diagnosed Gavin with "other specified paraphilic disorder with the qualifier nonconsent" and "antisocial personality disorder." Dr. Weitl opined that Gavin still suffers from this paraphilic disorder, as "this disorder doesn't change" and these types of paraphilias "can get stronger or weaker, but they don't flip." As part of her diagnosis, Dr. Weitl said, "it's inherent in the disorder that he's predisposed *** to continue engaging in nonconsecutive [*sic*] sexual behavior."

¶ 25   Dr. Weitl scored Gavin using the same actuarial instrument as Dr. Tsoflias and concluded that Gavin is "about 5.2 times more likely to commit another sex offense when compared to the

typical sex offender." Dr. Weitl relied as well on other factors to determine Gavin's likelihood to reoffend, including his deviant sexual interest, "[g]eneral self-regulation problems," intimacy deficits, sexual preoccupation, substance use, antisocial lifestyle, additional personality disorder, and lack of treatment. As with Dr. Tsoflias, Dr. Weitl said many of these factors could change with treatment.

¶ 26    Gavin's expert, Dr. Abbott, acknowledged Gavin's criminal history. Based on that history, he concluded that Gavin "formerly suffered from antisocial personality disorder" but concluded that he no longer does. Dr. Abbott believed that Gavin's antisocial personality disorder better explains his earlier sexual offenses than any possible diagnosis for a paraphilic disorder. Paraphilic coercive disorder "is a controversial diagnosis with little consensus as to diagnostic criteria" and was rejected for inclusion in the DSM-5. Dr. Abbott concluded that Gavin's behavior since being incarcerated in 1996 no longer meets the diagnostic criteria for antisocial personality disorder and so Gavin no longer suffers from it. Dr. Abbott's report ultimately concludes that Gavin does not currently suffer from a legally defined mental disorder.

¶ 27    According to Dr. Abbott, assuming Gavin had a mental disorder, Gavin did not present a substantial probability to reoffend. Dr. Abbott disputed the utility of the actuarial instruments on which Drs. Tsoflias and Weitl relied. But he used one of the same instruments and gave Gavin the same score that the State's experts gave him. Based on that score, Dr. Abbott gave Gavin a 26% chance of reoffending within five years. Dr. Abbott did not believe the science supported consideration of either dynamic risk factors or protective factors, as Drs. Tsoflias and Weitl had done. Dr. Abbott ultimately concluded that Gavin "does not meet the threshold of being much more likely than not [to] engage in sexually violent conduct."

¶ 28                    Trial Court Findings and Posttrial Litigation

¶ 29    After closing arguments, the trial court continued the case to consider the transcripts and reports before ruling. The trial court then ruled, granting the State's petition to find Gavin a sexually violent person:

"All right. I've reviewed the transcripts and this Court does find that the State has met its burden.

The respondent, he has been convicted of four acts under the statute, two convictions for aggravated criminal—let's see—attempt rape, rape, another attempt rape, and aggravated criminal sexual assault. He has been diagnosed with other specified paraphilic disorders, sexual attractive [*sic*] to nonconsenting females in a controlled environment as well as other—and other specified personality disorders with antisocial features. That's from one physician—from one forensic psychologist.

And my ruling is based on the credibility as well as the evidence. And based on that diagnosis it is substantially probable that he is probable to commit further acts of sexual violence. That's a substantial probability. It basically means more likely than not.

I did take into consideration the expert of—the testimony—the testimony of expert Brian Abbott on behalf of the respondent.

Again my ruling is based on the credibility of these witnesses. And, therefore, you have met your burden beyond a reasonable doubt."

¶ 30    Gavin filed a motion for a new trial raising many contentions of error. Of relevance, he argued that the trial court erred in admitting testimony that Gavin's recidivism rate between his

third and fourth offense was 100%. He added that the State failed to prove him a sexually violent person beyond a reasonable doubt and that "[t]he trial court misapprehended the law with respect to the risk of re-offense element of the cause of action." The trial court denied Gavin's motion and ordered him committed to DHS custody until further order.

¶ 31                                   Analysis

¶ 32                              Reasonable Doubt

¶ 33     To commit a person under the SVP Act, the State must prove three elements beyond a reasonable doubt: (i) the person must have been convicted of a sexually violent offense, (ii) the person must have a mental disorder, and (iii) the person's mental disorder must create a "substantial probability" that he or she will engage in acts of sexual violence. 725 ILCS 207/15(b)(1)(A), (b)(4), (b)(5) (West 2010). A " '[m]ental disorder' " refers to "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence. *Id.* § 5(b). Gavin does not dispute the State's proof of the first element. Under the SVP Act, we review challenges to the sufficiency of the evidence considering whether, viewing the evidence in a light most favorable to the State, any rational trier of fact could have found the elements in the SVP Act proven beyond a reasonable doubt. *In re Commitment of Fields*, 2014 IL 115542, ¶ 20.

¶ 34                          Presence of Mental Disorder

¶ 35     Gavin argues that the State failed to prove that he *presently* suffers from a mental disorder that predisposes him to sexual violence. He makes a threefold argument: (i) his conduct while in DHS custody was insufficient to show the presence of a mental disorder, (ii) the State engaged in "rampant speculation" because evidence suggesting paraphilic disorders are chronic and lifelong amounts to no more than an "unfounded assertion," and, (iii) even assuming

paraphilic disorders to be chronic and lifelong, the State failed to prove that Gavin ever had a mental disorder in the first place. The State responds that two experts relying on their training to reach a conclusion does not amount to speculation. Nor is it our role to question the trial court's resolution of the competing testimony of its experts and Dr. Abbott.

¶ 36    The Illinois Supreme Court has not given us guidance as to what sort of factual predicate suffices to establish the presence of a mental disorder. Instead, it has relied heavily on expert testimony, deferring to the factfinder on expert credibility. See *id.* ¶¶ 21-27. We followed *Fields* in *In re Detention of White*, 2016 IL App (1st) 151187, ¶¶ 58-62 (summarizing testimony and affirming where respondent's expert disagreed with two State experts on presence of mental disorder). Gavin has provided us with no basis to depart from *Fields* or *White*.

¶ 37    Gavin argues that, under the SVP Act, "allegations of possessing pornography of an unspecified type twice, pushing a staff member once, possessing marijuana once, and 2 to 3 other rule violations" do not translate to proof of a current mental disorder. Gavin's argument rests on a narrow reading of the record. We find the following excerpt from Dr. Tsoflias's testimony illuminating:

> "Paraphilias are chronic in nature. They don't just go away. So the fact that you have a paraphilia indicates that you always have that paraphilia in terms of that sexual interest. The intensity of the paraphilia may increase and decrease, but it's not something that ever goes away. And the paraphilia doesn't just have to be acting out behaviors. It also speaks of having these thoughts and fantasies and urges regarding the paraphilia.
>
> And in Mr. Gavin's case, he acted out sexually while in prison, which speaks to the strength of his urges even though he's in that controlled

environment. And since that time, he has been found to be in possession of very high levels of pornography, 300 hours of pornography on that hard drive, 10 DVDs of pornography, three VHS tapes of pornography, so—which is also against the rules of the [Temporary Detention Facility].

And so it shows that he still has the strong sexual urges and just because he hasn't acted out in the way of sexually assaulting nonconsenting women, it's very possible because of the chronicity of the disorder that he may be having these sexual fantasies when he's viewing the pornography, masturbating to the pornography. It shows that he's still preoccupied by sexuality, by sexual behavior towards women. So it shows that that disorder is still present today."

Similarly, Dr. Weitl explained the significance of Gavin's discipline in DHS custody, particularly the pornography possession. She said it shows that Gavin was not learning from consequences and refused to acknowledge that viewing pornography created a high-risk behavior for him. For Dr. Weitl, possessing pornography, regardless of the type of pornography, shows "that his urges are so strong that he'll risk the consequence of the institution to have that in his possession." Possession of pornography, in Dr. Weitl's opinion, also "fits right into" Gavin's "pattern [of] the sexual entitlement along with his objectifying females."

¶ 38     In short, Drs. Tsoflias and Weitl did not base their diagnoses solely on Gavin's discipline in DHS custody; if they had, the State likely would be backed into a tricky evidentiary corner. Rather, the experts testified that Gavin's disciplinary history suggested that the mental disorder that was already present had not abated or been successfully treated. We will say again, as we said in *White*, that the State can satisfy its burden on an SVP petition even in the complete absence of "sexually overt acts in the controlled environment of a prison." *Id.* ¶ 60 (citing *In re*

*Detention of Welsh*, 393 Ill. App. 3d 431, 455-56 (2009), and *In re Detention of Lieberman*, 379 Ill. App. 3d 585, 602 (2007)). Gavin sexually offended in Department of Corrections custody and committed sex-based rule violations while in DHS custody; it was not unreasonable for the trial court to credit the expert testimony that these behaviors showed evidence of a continuing mental disorder.

¶ 39    Gavin's remaining arguments as to the sufficiency of proof of his mental disorder ask us to reweigh the evidence in his favor, a task we cannot undertake. See *Fields*, 2014 IL 115542, ¶ 27. Gavin calls describing paraphilic disorders as chronic and lifelong "rampant" speculation. Dr. Tsoflias acknowledged that the DSM-5 does not expressly state that paraphilic disorders are chronic and lifelong, but she based her conclusion on her "knowledge [that] is amassed from all of the training and education that [she's] had over—through school through the past 10 years that [she's] been a clinician." Dr. Weitl testified that paraphilic disorders are chronic in the sense diagnosis looks "for a pattern of behavior" that follows a predictable course. She explained that "unless something intervenes human nature says they are going to keep doing it." Dr. Abbott disagreed and concluded that paraphilic disorder toward nonconsenting persons is not a chronic condition because "we have no science that they have ever looked at that disorder over a life span." He considered insufficient the "data about how it manifest[s] over a lifespan." The trial court expressly resolved the competing expert testimony by finding the State's witnesses more credible. We have no basis on which to question that determination, particularly given the technical nature of the dispute between the experts.

¶ 40    Gavin's final argument posits that he never had a mental disorder and that Drs. Tsoflias and Weitl impermissibly relied on the mere fact of his previous convictions to come to the

opposite conclusion. Again, we disagree. While the SVP Act forbids finding a mental disorder solely on the basis of earlier convictions for sexual offenses (725 ILCS 207/35(e) (West 2010)), that is not what Drs. Tsoflias and Weitl did. Both experts looked to the underlying conduct of the criminal offenses that Gavin committed, as is proper. See *White*, 2016 IL App (1st) 151187, ¶ 59 ("experts are not prohibited from relying on the underlying behaviors manifested during prior offenses in the diagnosis of a particular mental disorder"). They then described that conduct as evidence of Gavin's underlying attitudes towards women, sex, and the law.

¶ 41    More importantly, Drs. Tsoflias and Weitl relied on Gavin's own descriptions of those incidents to arrive at their conclusions. For instance, Dr. Tsoflias noted that Gavin (i) tended to minimize his responsibility for his criminal acts, (ii) "tend[ed] to blame the victim," and (iii) had "cognitive distortions about women" that led him to believe that he was entitled to sex, particularly from women who he perceives as "easy." Our review of the record does not show, as Gavin suggests, that the experts were so narrowly focused on the mere fact of the earlier convictions. Rather, the experts reasonably relied on the conduct that underlay the convictions and Gavin's own attitudes about those crimes that he had in 2015. We acknowledge Dr. Abbott's differing opinion but decline to substitute our judgment for that of the trial court.

¶ 42                    Substantial Likelihood to Reoffend

¶ 43    Gavin also challenges the sufficiency of the State's evidence to prove that his mental disorder created a substantial probability that he would reoffend. See 725 ILCS 207/15(b)(5) (West 2010) (State must prove "[t]he person is dangerous to others because the person's mental disorder creates a substantial probability that he or she will engage in acts of sexual violence."). As used in the SVP Act, " ' "substantially probable" ' " means " ' "much more likely than

not" ' " that Gavin will commit acts of sexual violence as a result of his mental disorder. *In re Commitment of Haugen*, 2017 IL App (1st) 160649, ¶ 24 (quoting *In re Commitment of Curtner*, 2012 IL App (4th) 110820, ¶ 37, and *In re Detention of Bailey*, 317 Ill. App. 3d 1072, 1086 (2000)).

¶ 44    Most of Gavin's challenge, again, relies on an attempt to have us substitute our judgments for the trier of fact's judgment. He argues two things: (i) the State's expert testimony did not sufficiently link his risk to reoffend to any mental disorder he may have, and (ii) even if the State adequately proved a causal link between Gavin's mental disorder and risk to reoffend, it failed to prove that the risk rose to the level of substantially probable.

¶ 45    We find that the State proved a link between Gavin's mental disorder and his risk of reoffending. Gavin claims that the State did no more than present evidence that Gavin had a mental disorder and it was substantially probable that he would reoffend but that it failed to show it was substantially probable he would reoffend *because of* a mental disorder. In support of his position he cites an appeal from summary judgment in a medical malpractice case. See *Hussung v. Patel*, 369 Ill. App. 3d 924, 933-34 (2007) (contemporaneous existence of act and injury does not create factual dispute about proximate cause). We agree with the State—its experts did more than testify that Gavin's mental disorder and substantial probability of reoffending merely existed at the same time.

¶ 46    Gavin begins by seeking to have us refine our definition of "substantially probable." He argues that "much more likely than not," the definition that has been repeatedly endorsed by this court since *In re Detention of Bailey*, 317 Ill. App. 3d 1072 (2000), lacks enough specificity. Gavin urges that we modify the definition of "substantially probable" to mean "much more than

50%" likely that he will reoffend. We have rejected a nearly identical argument as an improper intrusion on the province of the factfinder. See *In re Commitment of Haugen*, 2017 IL App (1st) 160649, ¶¶ 24-25. We see no reason to depart from this precedent.

¶ 47    Gavin's arguments use circular reasoning. He wants us to redefine the definition of "much more likely than not" because it would "eliminate confusion" about the SVP Act's elements. Yet, at the same time, he argues that it is self-evident that "much more likely than not" means "much more than 50%" because, as a matter of logic, these are the only outcomes of an SVP petition—"either an individual is dangerous because his mental disorder makes it substantially probable that he [or she] will reoffend, or he [or she] is not." Gavin supposes we need go no further in our definition than "much more likely than 50%" because the factfinder will be able to interpret that standard in light of the facts of a particular case.

¶ 48    We reject this argument for two reasons. Assuming it is a foregone conclusion that "much more likely than not" means "much more likely than 50%," we fail to see how a specific percentage further aids the trier of fact. Presumably, if it is as straightforward as Gavin presents, a reasonable trier of fact can apply the existing standard in the way Gavin hopes it will. We fail to see how altering the definition to "much more likely than 50%" assists the factfinder. Is 60% much more likely than 50%? What about 70%? 76%? Reducing "much more likely than not" to a percentage incorporates new and unnecessary complications. This, in part, explains why we do not permit trial courts to define "reasonable doubt" to juries. See *People v. Downs*, 2015 IL 117934, ¶¶ 6-7, 24-32 (affirming trial court's answer to jury that reasonable doubt " 'is your duty to define' " after jury asked: " 'What is your definition of reasonable doubt, 80%, 70%, 60%?' ").

¶ 49 The remainder of Gavin's argument catalogs the disputes between Drs. Tsoflias and Weitl and Dr. Abbott on the meaning of the actuarial instruments and the impact of the dynamic risk factors and protective factors. Gavin's brief details those differences. We need not repeat them because Gavin's argument attempts to have us retry him, which, to repeat, is not our role. See *Fields*, 2014 IL 115542, ¶ 27.

¶ 50 We also reject Gavin's primary point that the State's experts never linked their finding of a mental disorder to Gavin's likelihood to reoffend. Dr. Tsoflias made the connection in her initial testimony: "They have to be diagnosed with a mental disorder and they have to show that *due to that mental disorder*, it is substantially probable that they will engage in future acts of sexual violence." (Emphasis added). Dr. Weitl's testimony reveals the same understanding. When reading the experts' conclusions in their proper context, we find the record shows their determinations about Gavin's likelihood to reoffend eminently linked to their conclusions that he had a mental disorder.

¶ 51 We affirm the trial court's conclusion that the State proved the allegations in its SVP petition beyond a reasonable doubt.

¶ 52 The Trial Court's Application of the Legal Standard

¶ 53 Gavin next argues that we should remand for a new trial because the trial court applied an incorrect legal standard to find him an SVP under the SVP Act. Gavin reads the trial court's statement that he was "more likely than not" to reoffend as evidence that the court misapplied the law, which requires him to be "much more likely than not" to reoffend. The State responds that Gavin forfeited the argument and that, regardless, we should not find error in one isolated

statement by the trial court. Reviewing this issue *de novo*, *Reliable Fire Equipment Co. v. Arredondo*, 2011 IL 111871, ¶ 13, we agree with the State.

¶ 54    The State correctly argues forfeiture. Gavin did not object during the trial court's recitation of its findings. See *Haugen*, 2017 IL App (1st) 160649, ¶ 31 (to preserve claim litigant must make both timely objection and include alleged error in motion for new trial). In our opinion in Gavin's first appeal, we held that the criminal plain error rule applies to SVP proceedings. *Gavin*, 2014 IL App (1st) 122918, ¶ 55. The first step of any plain error inquiry asks whether an error occurred (*id.* ¶ 56), and should no error be found, we need go no further.

¶ 55    We presume the trial court knows the law and applies it properly, absent affirmative evidence to the contrary. *People v. Virella*, 256 Ill. App. 3d 635, 638 (1993). There must be "strong affirmative evidence" to rebut the presumption, and "[t]he decision of the circuit court will not be reversed based on an isolated statement." *People v. Weston*, 271 Ill. App. 3d 604, 616 (1995). Significantly, immediately before the trial court said "more likely than not," it repeated the proper standard of "substantially probable" twice. Defining the term " 'substantially probable' " to mean " 'much more likely than not' " was no more than a demonstration that the phrase " 'substantially probable' " was easily understood and did not require guesses as to its meaning or application. *Bailey*, 317 Ill. App. 3d at 1086. In other words, the court's ease in defining " 'substantially probable' " was evidence that the term was not vague. *Id.* Our review of the entire record, along with the trial court's statements, assures us that the court understood that there had to be a *substantial* probability that Gavin was likely to reoffend. The court's statement as to the synonymic phrase for "substantial probability" does not shake that assurance.

¶ 56    Even if we found error in applying the standard, remand would be unnecessary. Gavin cites our supreme court's decision in *Reliable Fire Equipment Co. v. Arredondo*, 2011 IL 111871, and contends that misapplication of the correct legal test requires a remand for a new trial. *Reliable*, though, is distinguishable. In *Reliable*, the entire trial court proceeding had been governed by the then-prevailing law in the Second District. See *id.* ¶ 46 ("the parties presented their evidence and fashioned their arguments based on the appellate court's rigid and preclusive *** test"). The supreme court in *Reliable* modified the appellate court's test. *Id.* ¶ 43. Because the parties had oriented their litigation strategies around a test that our supreme court refashioned on appeal, remand was necessary to allow the parties to provide supplemental evidence and argument. *Id.* ¶ 46. By contrast, here, the parties prepared for trial and questioned the witnesses with the correct standard. And we do not discern prejudice from the trial court's misstatement. See *In re Detention of Traynoff*, 358 Ill. App. 3d 430, 441 (2005) (requiring showing of prejudice from misstatement). Accordingly, the State presented sufficient evidence to prove Gavin an SVP under the correct standard ("much more likely than not").

¶ 57                                        Evidentiary Error

¶ 58    Gavin's final argument disputes the trial court's admission of Dr. Tsoflias's testimony that, in hindsight, Gavin's likelihood of reoffending in between his third and fourth criminal offense was 100%. Gavin argues the trial court's concern with Gavin's present-day likelihood of recidivism was irrelevant. The State responds that the evidence revealed that the actuarial tables are only estimates that will be shown to be either over- or under-estimates in hindsight. The State adds that it was relevant to show Gavin's increasing risk over time. Alternatively, the State

argues that Gavin was not prejudiced. We agree with Gavin that the evidence was irrelevant but agree with the State that the error was not prejudicial.

¶ 59    The admission of evidence falls within the discretion of the trial court; we will not reverse absent a showing of an abuse of discretion. *In re Detention of Melcher*, 2013 IL App (1st) 123085, ¶ 42. Gavin argues the trial court erred because evidence of his past recidivism rate was irrelevant. Evidence is relevant if it has " 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.' " *Id.* (quoting Ill. R. Evid. 401 (eff. Jan. 1, 2011)).

¶ 60    To determine relevancy, we must be precise in the description of the evidence. We have little trouble concluding that Gavin committed a fourth sexual offense and committed that offense while on parole for the third, which relates to the question of his likelihood to reoffend. We fail to see, however, the relevance of describing the likelihood that Gavin would commit his fourth offense in statistical terms. Looking back one could say that the likelihood that the action took place is 100%. But Gavin's recross-examination of Dr. Tsoflias reveals the futility of describing past events in this way. Dr. Tsoflias admitted that Gavin's commission of his fourth offense, while a statistical guarantee in hindsight, was not a guarantee at the time of his release from prison for this third offense. In other words, the fact that he was 100% likely to reoffend in hindsight had nothing to do with understanding his likelihood to reoffend at the time he was released.

¶ 61    But we do not agree that the error prejudiced Gavin. Dr. Tsoflias's initial answer to the State's question occupies one sentence of trial transcript spanning hundreds of pages. Gavin's counsel went on to clarify Dr. Tsoflias's answer, eliciting this:

"Q. So you're not saying that when he was released after his third offense that his risk at that time was 100 percent, right?

A. No, I'm not saying that that was his static risk. I'm saying in hindsight, looking backwards, it was 100 percent likely that he—it was 100 percent that he offended."

As we have said, the likelihood of occurrence for every action that took place in the past is 100%. Dr. Tsoflias's clarification that the 100% figure did not represent Gavin's risk at the time he was released for his third offense clarifies the initial testimony.

¶ 62    Although we conclude that the trial court erred in admitting Dr. Tsoflias's testimony regarding the 100% likelihood that Gavin would reoffend between his third and fourth offenses, Gavin's counsel eliminated any possibility of prejudice.

¶ 63    Affirmed.

---

**No. 1-18-0881**

---

| | |
|---|---|
| **Cite as:** | *In re Commitment of Gavin*, 2019 IL App (1st) 180881 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 06-CR-80009; the Hon. Steven G. Watkins, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Michael R. Johnson, Kate E. Levine, and Ian C. Barnes, of Johnson & Levine LLC, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Kwame Raoul, Attorney General, of Chicago (Jane Elinor Notz, Solicitor General, and Michael M. Glick and Evan B. Elsner, Assistant Attorneys General, of counsel), for the People. |

---