2025 IL App (1st) 1241037-U

SECOND DIVISION
November 12, 2025

No. 1-24-1037

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| *In re* COMMITMENT OF Zachary Hatter | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| (The People of the State of Illinois, | ) | |
| | ) | |
|    Petitioner-Appellee, | ) | |
| | ) | No. 10 CR 80010 |
| v. | ) | |
| | ) | |
| Zachary Hatter, | ) | Honorable |
| | ) | Laura Ayala-Gonzalez, |
|    Respondent-Appellant.) | ) | Judge Presiding. |

_____

PRESIDING JUSTICE VAN TINE delivered the judgment of the court.
Justices Ellis and D.B. Walker concurred in the judgment.

**ORDER**

¶ 1   *Held***:**  We affirm respondent's civil commitment as a sexually violent person where the evidence at trial supported the judgment. Additionally, the court did not err in declining to identify treatment goals for respondent.

¶ 2   In 1991, the circuit court found Zachary Hatter guilty of aggravated criminal sexual abuse and aggravated unlawful restraint and sentenced him to four years' imprisonment on each count,

to run concurrently. In 2009, he pled guilty to one count of aggravated criminal sexual abuse and one count of failure to register (as a sex offender) and was sentenced to five years and three years in prison, respectively, to run concurrently. In 2010, a week before Hatter's scheduled release from prison, the State petitioned the court to civilly commit Hatter under the Sexually Violent Persons Commitment Act (SVP Act) (725 ILCS 207/1 *et seq.* (West 2010)), citing aggravated criminal sexual abuse (720 ILCS 5/11-11.60 (West 2004) and attempted aggravated criminal sexual assault (720 ILCS 5/11-1.30 (West 1990)) as qualifying offenses.[1] On June 5, 2012, the court held a probable cause hearing and determined there was probable cause to believe that Hatter is an SVP. Hatter was then detained and evaluated at the Department of Human Services (DHS). Following a bench trial in March and April of 2022, the court found Hatter to be an SVP under the SVP Act. At the dispositional hearing, the court ordered him to be committed to secure treatment with DHS and did not identify treatment goals for him. Hatter appeals. For the following reasons, we affirm.

¶ 3                                         I. BACKGROUND

¶ 4                                         A. SVP Bench Trial

¶ 5    The central issue at trial was whether Hatter is an SVP; in other words, did Hatter have a mental disorder that makes it substantially probable that he would engage in sexually violent behavior if he were released? The State called two witnesses: Dr. Vasiliki Tsoflias and Dr. Steven Gaskell. Hatter did not call an expert witness, but he did testify for himself.

¶ 6                                         1. Dr. Vasiliki Tsoflias

---

[1]The State's citation to "attempted aggravated criminal sexual assault" in its 2010 petition appears to be a typographical error, as this charge was dismissed in Hatter's 1990 case. However, Hatter *was* convicted of aggravated criminal sexual abuse in the 1990 case, so we presume the State intended to cite this offense.

¶ 7    The parties stipulated that Dr. Tsoflias is an expert in clinical and forensic psychology, specifically in sex offender evaluations. Dr. Tsoflias testified consistently with her written report that she prepared on May 5, 2010, which was also admitted as evidence at trial. Because of Hatter's delusional thoughts and manic symptoms, Dr. Tsoflias was unable to obtain Hatter's consent prior to interviewing him. Hatter also refused to participate in the interview. Thus, Dr. Tsoflias relied on a variety of written records and materials to prepare her report. These materials included Hatter's master file, which contained disciplinary records from the Illinois Department of Corrections (IDOC), Illinois State Police records, Chicago Police Department criminal history reports, FBI criminal history reports, and parole violation reports. She also reviewed Hatter's IDOC medical file, which contained numerous mental health diagnostic and treatment notes, a May 13, 2009, evaluation, and medication administration record, among others.

¶ 8    Dr. Tsoflias's written report begins with a discussion of Hatter's history of sexual offenses. As to Hatter's 2005 case, Dr. Tsoflias recited the statement of facts:

>      "On March 4, 2005, at 121 N LaSalle (City Hall), Chicago IL; the defendant, Zachary Hatter, followed victim into an elevator and began masturbating while they were the only two people on the elevator. The defendant touched the victim's buttocks while he was masturbating and victim was afraid because they were in an enclosed area. The defendant also had not registered after his release from the Illinois Department of Corrections- Tinley Park Hospital. Defendant has been unfit several times, but is currently fit with medicine."

The report notes that this statement includes all available details of the offense, as "police reports available for this offense do not include additional information" and "due to the fact Mr. Hatter was unable to participate in the interview, his version of the offense is not available." In any event,

Hatter pled guilty to one count of aggravated criminal sexual abuse and one count of violation of sex offender registration.

¶ 9    As to Hatter's 1990 case, Dr. Tsoflias wrote:

> "On August 2, 1990 at 2120 W. Washington St in Chicago, victim EC was a caseworker for Kaleidoscope. The defendant was living at the Val Mar Hotel as part of the program through Kaleidoscope. On August 2,1990, EC notified the defendant that she was going to stop at his apartment to fulfill his home check requirement. When Ms. Cox arrived, the defendant allowed her to enter his residence. He then dead bolted the door and, while armed with a ten inch butcher knife, demanded that the victim remove her clothing. The victim remained calm as the defendant continued to demand that she remove her clothing. The defendant placed his hand on her breast. The defendant stated that he wanted to have oral sex with the victim. The victim escaped from the defendant's apartment."

The report notes police reports for this offense were not available, and, again, Hatter's version of the story was unavailable due to his unwillingness to participate in the interview.

¶ 10    Dr. Tsoflias noted that since October 21, 2000, while in IDOC custody, Hatter received 63 disciplinary tickets, 19 of which were for sexual misconduct, including masturbating in front of female staff and exposing his erect penis to staff. She also noted that the records did not indicate that Hatter had been offered or attended sex offender treatment.

¶ 11    Based on a review of Hatter's criminal record, IDOC master files, treatment summaries, and manic behavior while Dr. Tsoflias attempted to obtain consent for an interview, Dr. Tsoflias diagnosed Hatter with bipolar disorder with psychotic features. She also diagnosed Hatter with exhibitionistic disorder.

¶ 12    In the remainder of her report, Dr. Tsoflias assessed the risk that Hatter posed if he were released into society. Dr. Tsoflias first noted that social scientific studies have shown that the most accurate method of predicting the likelihood of sexual offense recidivism among sex offenders is using actuarial analysis rather than relying solely on clinical judgment from mental health professionals. She relied on two actuarial instruments: the Static-99R and the MnSOST-R. The Static-99R instrument scored Hatter with a "5", which placed him in the moderate-high risk category. However, Dr. Tsoflias opined that a more representative score would have been "6", which would have placed Hatter in the high-risk category. She explained that she would have assigned a score of "6" because Hatter has not engaged in sex offender treatment and has continued to act out sexually while in prison. The MnSOST-R instrument was developed as a tool to identify predatory and violent sexual offenders. He scored a "6" on a scale from -16 to 31, which placed him in the moderate risk of sexual re-offense category.

¶ 13    The report then analyzed dynamic risk factors. Dr. Tsoflias identified three: (1) general criminality/lifestyle instability, (2) lack of treatment, and (3) sexual self-regulation. As to the first, the report noted that Hatter had been arrested numerous time on various charges, including battery, theft, disorderly conduct, criminal damage to property, burglary, and aggravated assault, and has been convicted of attempted murder, attempted armed robbery, aggravated discharge of a firearm, aggravated criminal sexual abuse twice, aggravated unlawful restraint, and violation of sex offender registration. Additionally, he received 63 disciplinary tickets in prison. As to the second factor, Dr. Tsoflias noted that Hatter did not attend treatment while incarcerated. As to sexual self-regulation, Dr. Tsoflias noted that Hatter has been convicted of two sexual offenses and has been unable to regulate his sexual impulses even in prison, as evidenced by the 19 sexual misconduct tickets he received while incarcerated.

¶ 14 The report turned to protective factors. First, the report stated that although Hatter's offenses occurred 15 years apart, he was only in the community for four years without a conviction in that time period. So, he was not free of offenses for a significant time (10 years is usually viewed as significant). The report noted that Hatter did not suffer from any health conditions that would decrease his risk of future sexual violence; to the contrary, his psychiatric condition may actually increase his risk of recidivism. Again, Dr. Tsoflias noted that Hatter did not attend or complete a sex offender treatment program, so that protective factor did not apply in Hatter's case.

¶ 15 Finally, the report considered case-specific factors, which Dr. Tsoflias describes as "similar to dynamic risk factors." First, Hatter had been convicted of two sexually violent offenses against women. In both cases, the women were assaulted in confined spaces. In prison, Hatter had received 19 sexual misconduct tickets. Second, Hatter has a history of chronic mental illness with symptoms including mania and psychosis. These symptoms may interfere with Hatter's ability to control his sexual urges and prevent future sexual offenses. Third, Hatter has a history of numerous arrests and psychiatric hospitalizations. Finally, Hatter has been court-ordered to civil commitment based on clear and convincing evidence. Hatter suffers from a mental illness interfering with his ability to provide for his basic needs and guard himself from serious harm without assistance of family or outside help.

¶ 16 Based on the foregoing, Dr. Tsoflias recommended that Hatter be found an SVP and be civilly committed. She did not identify any treatment goals for Hatter.

¶ 17                                    2. Dr. Steven Gaskell

¶ 18 The parties also stipulated that Dr. Gaskell is an expert in clinical and forensic psychology, specifically in sex offender evaluations. Dr. Gaskell testified he was assigned to Hatter's case in 2014. He reviewed Hatter's master file, interviewed Hatter, and prepared a written report. Dr.

Gaskell was able to obtain Hatter's consent for the interview. The interview lasted approximately two hours. Hatter's presentation varied widely throughout the interview. At times, he would speak at a normal rate; at other times, he would become agitated and talk loudly or quickly. Sometimes his responses were coherent and logical; other times, they appeared delusional. Observing Hatter's presentation aided Dr. Gaskell in understanding his mental state. Dr. Gaskell concluded that Hatter met the criteria for an SVP diagnosis. Dr. Gaskell updated his report in 2017, 2021, and 2022, and did not change his ultimate conclusion that Hatter was an SVP.

¶ 19    Dr. Gaskell diagnosed Hatter with three disorders: (1) other specified paraphilic disorder with exhibitionism and sexual attraction to non-consenting females, non-exclusive type; (2) antisocial personality disorder; and (3) schizoaffective disorder, bipolar type. With respect to the first diagnosis, Dr. Gaskell relied on Hatter's sexually violent convictions and his behavior in the DHS Treatment and Detention Facility (TDF), which included threats to sexually assault women as well as intentionally bumping against the buttocks of a nurse and another detainee. As to the second diagnosis, which Dr. Gaskell defined as a "pervasive pattern of disregard for violation of the rights of others," Dr. Gaskell explained that Hatter's antisocial behavior began at the age of 13, as evidenced by his placement in juvenile detention three times. Even as an adult, Hatter exhibited irritability and aggressiveness, as indicated by his repeated fights and assaults, which Dr. Gaskell noted from police reports. Even in treatment, Hatter continued to be violent; Dr. Gaskell cited one incident from November of 2021, in which Hatter got into a physical altercation with another TDF resident. Finally, as to the third diagnosis, Dr. Gaskell explained that Hatter had a combination of schizophrenia symptoms, including hallucinations, delusions, and disorganized thoughts and behavior. Additionally, he had a mood disorder – in this case bipolar disorder – which

manifests in mania, rapid speech, racing thoughts, and sexual preoccupation. Dr. Gaskell opined that Hatter continued to suffer from all three disorders as of the date he testified.

¶ 20   In assessing Hatter's risk, Dr. Gaskell, too, relied on actuarial tools, including the Static-99R and Static-2002R. Hatter scored "seven" on the Static-99R instrument. He explained that a score of seven falls in the highest risk range and places Hatter in the 97th percentile. Dr. Gaskell stated that Hatter is 5.25 times more likely to reoffend than the average sexual offender. Further, the Static-2002R placed Hatter in the second highest risk range, which is above-average risk and in the 88th percentile. This instrument predicted that Hatter is 2.63 times more likely to reoffend than the average sexual offender.

¶ 21   Dr. Gaskell then assessed risk factors and protective factors. He identified eleven risk factors: sexual preoccupation, deviant sexual interests, paraphilic interests, attitudes tolerant of sexual crime, antisocial personality disorder, hostility, impulsiveness, recklessness, employment instability, non-compliant with supervision, severely disordered and psychotic, and self-regulation problems. He concluded that this was a very dangerous combination of risk factors. Dr. Gaskell next considered protective factors (age, health status, and progress in sex offense-specific treatment), and he did not find that any were present in Hatter's case. He concluded that Hatter satisfied the criteria for an SVP diagnosis.

¶ 22                                    3. Zachary Hatter

¶ 23   Hatter testified that he has five sisters named "One, Two, Three, Four, Five" and five brothers named "Orange, Yellow, Purple, Blue, and White." In 1986, when he was 16, he was pushed in front of a CTA train and suffered serious injuries. He spent six months in the hospital recovering. He also testified that he would like to go to Elgin Mental Health Center, asking the court "Can I go to Elgin, ma'am?".

¶ 24                    4. The Circuit Court's Decision

¶ 25    The circuit court found both Dr. Tsoflias and Dr. Gaskell credible and found Hatter to be an SVP.

¶ 26                    B. Dispositional Hearing

¶ 27    On April 3, 2024, the circuit court held a dispositional hearing to determine whether to conditionally release Hatter or commit him to a secure facility, as required by the SVP Act. See 725 ILCS 207/40(b) (West 2024). The State called Dr. David Suire, an expert in the field of sex offender evaluation and treatment and forensic psychology, to testify. Dr. Suire opined Hatter required heightened therapeutic services, assistance, and supervision that could not be provided in the community. Conditional release would not be appropriate because Hatter was not "stable enough" and did not have "sufficient control to be treated outside of a secure setting." He did not make any recommendations as to treatment goals.

¶ 28    At the end of Dr. Suire's testimony, Hatter's lawyer requested the court to include individualized treatment goals for Hatter in its order. These included improving Hatter's (1) ability to read and write; (2) motivation for treatment; (3) mental stability; and (4) understanding of the court proceedings and need for treatment. The court declined, reasoning:

>    "I understand the complexity of not only developing a treatment plan for Mr. Hatter but I also have read the Act and People versus *Hayes*[2] and I do not believe that I will be using any discretion at this juncture to specifically individualize goals for Mr. Hatter because I believe based on the testimony and the report the treatment team is working actively to identify more direct and concrete areas for treatment individually for Mr. Hatter

---

[2]*In re Detention of Hayes*, 321 Ill. App. 3d 178 (2001).

and I don't believe that the court can impose anything further that has not been addressed or raised or identified for Mr. Hatter."

¶ 29    Hatter appeals.

¶ 30                            II. ANALYSIS

¶ 31    On appeal, Hatter argues that (1) the State did not prove beyond a reasonable doubt that he is an SVP, and (2) the court erred in declining to identify treatment goals for him.

¶ 32                            A. The SVP Act

¶ 33    The SVP Act (725 ILCS 207/1 *et seq.* (West 2014)) allows the State to extend the incarceration of a criminal defendant beyond the time he would otherwise be released, if it can show that the defendant is sexually violent. *In re Detention of Hardin*, 391 Ill. App. 3d 211, 216 (2009). A person is deemed sexually violent if he has been convicted of a sexually violent offense and is dangerous because he suffers from a mental disorder that makes it substantially probable that he will engage in acts of sexual violence. *Id.* The SVP Act authorizes involuntary commitment of an SVP "for control, care and treatment until such time as the person is no longer a sexually violent person." *Id.*; 725 ILCS 207/40(a) (West 2014). Proceedings under the SVP Act are civil in nature. *Hardin*, 391 Ill. App. 3d at 216.

¶ 34    As a defendant who has committed a sexually violent offense nears his prison release date, the State may file a petition to commit him to DHS secure treatment as an SVP. *Id.* at 216-17. If the State files such a petition, the court "shall hold a hearing to determine whether there is probable cause to believe that the person named in the petition is a sexually violent person." *Id.* at 217; 725 ILCS 207/30(b) (West 2014). If the court determines that there is probable cause to believe that the defendant is an SVP, the court must order the person to be taken into custody and transferred to an appropriate facility for an evaluation as to whether the person is an SVP. 725 ILCS 207/30(c)

(West 2014). If the court does not find probable cause, it must dismiss the petition. *Id*. Within 120 days after the probable cause hearing, a trial must be held to determine whether the person is an SVP. 725 ILCS 207/35(a) (West 2014). If the court finds a person to be an SVP, it must hold a dispositional hearing to determine whether the person will be committed to institutional care in a secure facility or conditionally released. *In re Commitment of Fields*, 2014 IL 115542, ¶ 30. We begin with Hatter's challenge to the sufficiency of the evidence.

¶ 35                                        B. Sufficiency of the Evidence

¶ 36     Hatter argues that the State has failed to prove that he has a mental disorder that makes it substantially probable he will engage in future acts of sexual violence. When reviewing claims challenging the sufficiency of the evidence, we consider whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could find the elements proved beyond a reasonable doubt. *In re Commitment of Fields*, 2014 IL 115542, ¶ 20. We will not substitute our judgment for that of the trier of fact regarding the credibility of the witnesses or the weight to be given the evidence. *Id.* In SVP cases, our supreme court has "relied heavily on expert testimony, deferring to the factfinder on expert credibility." *In re Commitment of Gavin*, 2019 IL App (1st) 180881, ¶ 36.

¶ 37     To establish that Hatter was an SVP, the State had to prove beyond a reasonable doubt that (1) he was convicted of a sexually violent offense; (2) he has a qualifying mental disorder; and (3) the mental disorder makes it substantially probable that he will engage in acts of sexual violence. 725 ILCS 207/5(f), 45(d) (West 2022).

¶ 38                                        1. Sexually Violent Offenses

¶ 39     Hatter's underlying 1991 and 2009 convictions for aggravated criminal sexual abuse (720 ILCS 5/11-11.60 (West 2004)) qualify as sexually violent offenses under the SVP Act. See 725 ILCS 207/5(e) (West 2022).

¶ 40                                         2. Mental Disorder

¶ 41     The second element the State must prove is that the defendant has a qualifying mental disorder. A "mental disorder" is a "congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence." 725 ILCS 207/5(b) (West 2022).

¶ 42     Hatter argues that the State failed to prove that he has a condition that predisposes him to acts of sexual violence. As to Dr. Tsoflias's diagnosis of exhibitionism, Hatter contends that it does not predispose him to engage in acts of sexual violence because merely exposing one's penis or masturbating in public, as he has done, are not sexually violent offenses under the statute. Hatter does not dispute Dr. Tsoflias's diagnosis of bipolar disorder with psychotic features. As to Dr. Gaskell's diagnosis of schizoaffective disorder, Hatter argues that there was no testimony explaining how this diagnosis predisposes him to sexual violence. Hatter does not address Dr. Gaskell's diagnosis of antisocial personality disorder.

¶ 43     In her testimony, however, Dr. Tsoflias explained that Hatter's exhibitionism, in conjunction with his schizoaffective disorder, leads to sexual acting out, which led to his SVP-eligible offenses in the past, which were violent sexual offenses. Dr. Tsoflias further elaborated that the combination of these disorders leads to hypersexual impulses and his inability to control urges. Again, there is evidence from Hatter's past that the combination of these disorders leads to sexual violence. Dr. Gaskell relied on Hatter's threats to sexually assault TDF staff, his acts of bumping against the buttocks of a female nurse, his fights with other residents, and his breaking

of various objects to conclude that respondent's inability to control himself would cause harm to somebody. Hatter did not present any evidence to rebut either doctor's testimony.

¶ 44    Based on the foregoing, we conclude that the State met its burden of proving Hatter has a congenital or acquired condition that affects his emotional or volitional capacity that predisposes him to engage in acts of sexual violence. Any rational trier of fact could find that the State proved Hatter had a qualifying mental disorder beyond a reasonable doubt.

¶ 45                              3. Substantial Probability

¶ 46    After establishing that a defendant has a qualifying mental disorder, the State must show that such disorder makes it "substantially probable" that he will engage in acts of sexual violence in the future. 725 ILCS 207/5(f), 45(d) (West 2022). As used in the SVP Act, "substantially probable" means much more likely than not that Hatter will commit acts of sexual violence because of his mental disorder. *Gavin*, 2019 IL App (1st) 180881, ¶ 43. Hatter argues that the State failed to prove that it is substantially probable that he will engage in future acts of sexual violence because the actuarial instruments they used overestimated Hatter's risk, as they included the risk of engaging in *any* sexual offense, not just a violent one. Essentially, this is the same argument as Hatter made regarding the qualifying mental disorder element: the State did not prove substantial probability to re-engage in sexual *violence*.

¶ 47    Both Dr. Tsoflias and Dr. Gaskell concluded that Hatter's mental disorders make it substantially probable that he will reoffend. In reaching these conclusions, they relied not only on actuarial calculations but also considered risk factors as well as (the lack of) protective factors. They conducted a comprehensive risk analysis. They balanced the results of their actuarial calculations, the dynamic risk factors, and the complete lack of protective factors, and reached

their conclusions that Hatter was substantially probable to reoffend. Again, Hatter did not present any evidence to rebut the doctors' testimony.

¶ 48    Hatter's challenge to the sufficiency of the evidence is essentially an attack on the weight of the evidence and witness credibility, neither of which is within our power to re-weigh or re-evaluate. *In re Detention of White*, 2016 IL App (1st) 151187, ¶ 62.

¶ 49    Based on the foregoing, we find that any rational trier of fact could find that the State proved beyond a reasonable doubt that Hatter had a qualifying mental disorder that made it substantially probable that he would reoffend. In other words, any rational trier of fact could find Hatter to be an SVP.

¶ 50                              C. Treatment Goals

¶ 51    Hatter argues that the circuit court erred in declining to identify treatment goals for him; that is, he argues that the SVP Act required the circuit court to identify treatment goals.

¶ 52    Our starting point is the plain language of the SVP Act, as we are tasked with determining whether it mandates the circuit court to identify treatment goals in every case.  The parties agree that section 40(b)(2) is the relevant portion of the SVP Act, and it reads as follows:

>    "An order for commitment under this Section shall specify either institutional care in a secure facility, as provided under Section 50 of this Act, or conditional release. In determining whether commitment shall be for institutional care in a secure facility or for conditional release, the court shall consider the nature and circumstances of the behavior that was the basis of the allegation in the petition under paragraph (b)(1) of Section 15, the person's mental history and present mental condition, and what arrangements are available to ensure that the person has access to and will participate in necessary treatment. All treatment, whether in institutional care, in a secure facility, or while on conditional release,

shall be conducted in conformance with the standards developed under the Sex Offender Management Board Act and conducted by a treatment provider licensed under the Sex Offender Evaluation and Treatment Provider Act. The Department shall arrange for control, care and treatment of the person in the least restrictive manner consistent with the requirements of the person and in accordance with the court's commitment order." 725 ILCS 207/40(b)(2) (West 2022).

¶ 53    We see nothing in this language that *requires* the circuit court to identify a treatment plan or treatment goals. The statute requires the court to specify either secure treatment or conditional release; there is no dispute the court did so here. The statute requires the court to consider the nature and circumstances of the behavior that was the basis of the SVP petition; Hatter does not dispute the court did so here. According to the court in *Hayes*, the SVP Act "authorize[s] a trial court to identify an individual's specific treatment needs and frame a commitment order consistent with those needs." *In re Detention of Hayes*, 321 Ill. App. 3d 178, 194 (2001). Again, we see no mandate here. The *Hayes* court recognized that the circuit court has the *authority* to identify treatment needs; it did not hold that the circuit court was *required* to identify treatment needs. The court here declined to identify goals because it believed based "on the testimony and the report the treatment team [was] working actively to identify more direct and concrete areas for treatment individually for Mr. Hatter and [it did not] believe that the court [could] impose anything further that has not been addressed or raised or identified for Mr. Hatter." Based on the plain language of the SVP Act, we find no error in the circuit court's decision and do not disturb it.

¶ 54    Because the SVP Act does not require the circuit court to identify treatment goals, Hatter's argument is without merit, and we affirm the circuit court's decision to decline doing so.

¶ 55                                    III. CONCLUSION

¶ 56    For these reasons, we affirm the judgment of the circuit court of Cook County.

¶ 57    Affirmed.